[Crim. No. 14996. In Bank. Feb. 24, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTHONY CHRISTOPHER MATTISON, Defendant and Appellant.

COUNSEL

Myron Wigderson, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, William E. James, Assistant Attorney General, and William V. Ballough, Deputy Attorney General, for Plaintiff and Respondent.

OPINION

**WRIGHT, C. J.**—Anthony Christopher Mattison was charged by information with the murder of John Lawrence Corcoron. Following a trial by jury he was found guilty of murder in the second degree. On his appeal from the judgment of conviction he asserts, inter alia, that it is legally impossible to be convicted of second degree murder when that murder has been perpetrated by means of poison. We have concluded that the conviction of second degree murder was proper and that the judgment should be affirmed.

Both defendant and decedent were inmates of the California Institution for Men at Chino. Defendant was a technician in the medical laboratory and had previously offered to sell alcohol to inmates. Decedent, who had a history of alcoholism, asked inmate Hammond where he could obtain some alcohol and Hammond told him to see defendant.

The following day, Saturday, June 22, 1968, defendant asked Hammond

if decedent's credit was good and Hammond said he would guarantee it. A short time later Hammond saw decedent with an 8-inch-high brown bottle. Decedent then poured some of the contents of the bottle into a glass, squeezed an orange into it and tasted the mixture. A few hours later decedent appeared to have been drinking. Hammond again observed decedent pour more of the mixture into a glass and drink it. Hammond saw decedent later that night, at which time decedent appeared to be drunk. The following morning, Sunday, June 23, defendant approached Hammond and asked him if he had seen decedent. At that time defendant gave Hammond a slip of paper and said, "Give this to Jack [decedent's nickname]. This is for the items that I want, for the stuff he got."

Decedent was not feeling well all day Sunday, and on Monday morning he collapsed and became violently ill. Other inmates and the prison chaplain began inquiring as to what decedent had to drink. That same morning defendant told Hammond and another inmate that he had given decedent 8 ounces of grain alcohol and 8 ounces of sterile water. In the meantime decedent became increasingly ill and could not see very well. Decedent told a hospital attendant that he had taken 16 ounces of alcohol which he had received from defendant; that he knew he was dying and did not want defendant to get away with it; and that he wanted to see his wife and a priest. He died shortly thereafter.

A doctor testified that decedent's urine was green, that he had been in intense pain, had been vomiting, and had gone blind. These were all symptoms of methyl alcohol poisoning, and it was the doctor's opinion that methyl alcohol poisoning was the cause of death. A blood sample taken from decedent revealed a toxic dose of methyl alcohol. A pathologist testified that the results of an autopsy performed on decedent were consistent with those found in cases of methyl alcohol poisoning.

A clinical laboratory technologist, who supervised defendant and other inmates working in the laboratory, testified that the hospital did not use either ethyl or pure grain alcohol, but that 8 ounces of methyl alcohol were kept in the laboratory, not under lock and key. He further testified that inmates had access to the methyl alcohol during their training period and that he usually told every new trainee that it was poison.

The jury was fully instructed on first degree murder, second degree murder, second degree felony murder, and involuntary manslaughter. They were also specifically instructed that if they found the offense to be murder perpetrated by means of poison they had no alternative but to designate the offense as murder in the first degree. The jury returned a verdict of second degree murder. Defendant contends that a person charged with

murder by poison is either guilty of first degree murder or is innocent of the commission of any murder. He therefore claims that the jury's verdict of second degree murder was improper and that he should stand acquitted of the crime of murder. For the reasons stated below, we have concluded that the jury could have properly found defendant guilty of murder in the second degree, even though the death was caused by poison.

At the relevant time[1] the applicable sections of the Penal Code provided:

"Murder is the unlawful killing of a human being, with malice aforethought." (Pen. Code, § 187.)

"Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow-creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (Pen. Code, § 188.)

"All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of wilful, deliberate, and premeditated killing . . . is murder of the first degree. . . ." (Pen. Code, § 189.)

■ Thus if a killing is murder within the meaning of sections 187 and 188, and is by one of the means enumerated in section 189, the use of such means makes the killing first degree murder as a matter of law. It must be emphasized, however, that a *killing* by one of the means enumerated in the statute is not murder of the first degree unless it is first established that it is *murder*. ■ If the killing was not murder, it cannot be first degree murder, and a killing cannot become murder in the absence of malice aforethought. Without a showing of malice, it is immaterial that the killing was perpetrated by one of the means enumerated in the statute.

■ It is true that murder may be committed without express malice, i.e., without a specific intent to take human life. To be so committed, however, unless the felony-murder rule is applicable, "the defendant must intend to commit acts that are likely to cause death and that show a conscious disregard for human life." (*People* v. *Thomas* (1953) 41 Cal.2d 470, 479 [261 P.2d 1] (concurring opinion).) In other words, to make possible a conviction of murder based on implied malice, there must first be a finding that—although there was no deliberately formed and premeditated intent to kill, the killing proximately resulted from an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of

---

[1]Sections 187 and 189 have since been amended in a manner which is not relevant to this case.

another and who acts with conscious disregard for life." (*People* v. *Phillips* (1966) 64 Cal.2d 574, 587 [51 Cal.Rptr. 225, 414 P.2d 353].)

The above rules apply to all murders, other than felony murders, regardless of whether they are committed by one of the means enumerated in section 189. Thus, "in the case of a killing by torture, it is not enough to show that the killing was by a means that incidentally caused pain and suffering to the victim. (*People* v. *Bender,* 27 Cal.2d 164, 177-178 [163 P.2d 8].) It must be established that the defendant intended to 'cause cruel suffering on the part of the object of the attack, either for the purpose of revenge, extortion, persuasion, or to satisfy some other untoward propensity.' (*People* v. *Tubby,* 34 Cal.2d 72, 77 [207 P.2d 51]; *People* v. *Daugherty,* 40 Cal.2d 876, 886 [256 P.2d 911]; *People* v. *Martinez,* 38 Cal.2d 556, 561 [241 P.2d 224].) The defendant need not intend that his victim die as a result of the torture, since his intention to commit acts that involve a substantial risk to human life makes him guilty of first degree murder if a death results. (*People* v. *Tubby, supra,* 34 Cal.2d 72, 77.)" (*People* v. *Thomas, supra,* 41 Cal.2d 470, 478 (concurring opinion).)

Similarly, in the case of a killing committed by lying in wait, it is not sufficient to merely show the elements of waiting, watching and concealment. It must also be shown that the defendant did those physical acts with the intent to take his victim unawares and for the purpose of facilitating his attack. (*People* v. *Tuthill* (1947) 31 Cal.2d 92, 100 [187 P.2d 16].) When it is contended that a killing was committed by poison it likewise must be established that the killing was murder. "[I]t is not enough to show that a poison was administered and that a death resulted. If the poison was innocently given under the belief that it was a harmless drug and that no serious results would follow, there would be no malice, express or implied, and any resulting death would not be murder. (*People* v. *Milton* (1904) 145 Cal. 169, 170-171 [78 P. 549].) If, however, the defendant administered poison to his victim for an evil purpose, so that malice aforethought is shown, it is no defense that he did not intend or expect the death of his victim. [Citations.]" (*People* v. *Thomas, supra,* 41 Cal.2d 470, 478 (concurring opinion).)

■ From the above cases it is clear that before the question can arise of whether a killing is murder of the first degree because committed by one of the enumerated means, it must first be established that the killing was with malice aforethought. In the instant case there was no evidence that the defendant entertained a specific intent to kill decedent. Therefore, in order to find defendant guilty of the crime of murder, except under the felony-murder instructions that we consider below, the jury must have been satisfied beyond a reasonable doubt that he had full knowledge that his

conduct endangered the life of decedent, but that he nevertheless deliberately administered the poison with conscious disregard for that life. The evidence which would support such a conclusion was far from convincing. The clinical laboratory technician who supervised defendant and other inmates working in the hospital testified that he usually told every new trainee that nothing in the laboratory could be taken internally and that all of it was poison. In addition the word "poison" appeared on the label of the bottle. There was no other evidence either as to defendant's complete knowledge of the dangerous propensities of the methyl alcohol or as to defendant's wilful disregard of that known danger. The amount of evidence that was adduced may or may not have been sufficient to support a conviction of first degree murder by poison. That is not the question before us. We are only called upon to decide whether the jury could have entertained a reasonable doubt as to whether defendant acted with malice. We have concluded that the evidence on this issue was not so convincing that the jury could not have properly rejected the prosecution's theory of first degree murder by poison.

It does not follow, however, that we must accept defendant's contention that if he was not guilty of first degree murder then he must be found innocent of the commission of any murder. Under the instructions given, the jury's verdict was proper on the basis of the second degree felony-murder rule. ■ Although the Penal Code does not expressly set forth any provision for second degree felony murder, it is well-settled that certain felonies inherently dangerous to human life, exclusive of those enumerated in Penal Code section 189, can support application of the felony-murder rule. (*People* v. *Phillips, supra,* 64 Cal.2d 574, 582.)

The jury was instructed:

"The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs as a direct causal result of the commission of or attempt to commit a felony inherently dangerous to human life, namely, the crime of wilfully poisoning food, drink, or medicine, and where there was in the mind of the perpetrator the specific intent to commit such crime is murder of the second degree.

"The specific intent to poison food, drink, or medicine and the commission of or attempt to commit such crime must be proved beyond a reasonable doubt." (CALJIC 305.02.)

"Every person who wilfully mingles any poison with any food, drink or medicine, with intent that the same shall be taken by any human being to his injury, is guilty of a felony." (Pen. Code, § 347.)

■ Defendant, relying on our decision in *People* v. *Ireland* (1969)

70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580], contends that it was error to give the above felony-murder instruction. *Ireland* held that "a second degree felony-murder instruction may not properly be given when it is based upon a felony which is an integral part of the homicide and which the evidence produced by the prosecution shows to be an offense included *in fact* within the offense charged." (*People* v. *Ireland, supra,* 70 Cal.2d 522, 539.) Defendant claims that the offense of administering poison with the intent to injure is an "integral part of" and "included in fact within the offense" of murder by poison. We do not agree.

■ "The purpose of the felony-murder rule is to deter felons from killing negligently or accidentally by holding them strictly responsible for killings they commit" (*People* v. *Washington* (1965) 62 Cal.2d 777, 781 [44 Cal.Rptr. 442, 402 P.2d 130]). In *Ireland,* the underlying felony was assault with a deadly weapon, and application of the felony-murder rule in such cases "would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of a felonious assault—a category which includes the great majority of all homicides." (*People* v. *Ireland, supra,* 70 Cal.2d 522, 539.) We concluded that such a result would extend the operation of that rule "beyond any rational function that it is designed to serve." (*Id.*)

The instant case, however, presents an entirely different situation from the one that confronted us in *Ireland.* The facts before us are very similar to *People* v. *Taylor* (1970) 11 Cal.App.3d 57 [89 Cal.Rptr. 697], in which the victim died as a result of an overdose of heroin which had been furnished to her by the defendant. The defendant was convicted of second degree murder and the question presented was whether application of the felony-murder rule constituted error under *Ireland.* After a thorough review of cases from other jurisdictions whose underlying reasoning was adopted by *Ireland,* the *Taylor* court concluded that application of the felony-murder rule was proper because the underlying felony was committed with a "collateral and independent felonious design." (*People* v. *Taylor, supra,* 11 Cal.App.3d 57, 63.) ■ In other words the felony was not done with the intent to commit injury which would cause death. Giving a felony-murder instruction in such a situation serves rather than subverts the purpose of the rule. "While the felony-murder rule can hardly be much of a deterrent to a defendant who has decided to assault his victim with a deadly weapon, it seems obvious that in the situation presented in the case at bar, it does serve a rational purpose: knowledge that the death of a person to whom heroin is furnished may result in a conviction for murder should have some effect on the defendant's readiness to do the furnishing." (*People* v. *Taylor, supra,* 11 Cal.App.3d 57, 63.) The instant case is virtually indistinguishable

from *Taylor,* and we hold that it was proper to instruct the jury on second degree felony murder.

■ We recognize that our conclusion distinguishes between the malice implied solely from a violation of section 347 of the Penal Code and the malice implied from the doing of an "act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." (*People* v. *Phillips, supra,* 64 Cal.2d 574, 587.) When malice is implied in the latter situation, murder by poison is murder in the first degree. The malice inherent in the former situation is sufficient to support only a finding of murder in the second degree. To hold otherwise would convert conduct into first degree murder which but for section 347 would be only manslaughter. Absent section 347, a defendant who administered poison to another not with conscious disregard for life, but only for the purpose of making the other mildly ill or intoxicated, could at most be found guilty only of involuntary manslaughter if an unexpected death resulted. (Pen. Code, § 192, subd. 2.) By making it a felony to administer poison with the intent to cause any injury, the Legislature has evidenced its concern for the dangers involved in such conduct, and the invocation of the second degree felony-murder rule in such cases when unforeseen death results serves further to deter such dangerous conduct. To go further, however, and hold that even in the absence of a conscious disregard for life, the use of poison is enough not only to supply the implied malice of murder but to make that murder of the first degree would make the use of poison serve double duty and result in criminal liability out of all proportion to the *"turpitude of the offender."* (*People* v. *Wolff* (1964) 61 Cal.2d 795, 822 [40 Cal.Rptr. 271, 394 P.2d 959], italics in the original.) It would extend the felony-murder doctrine "beyond any rational function that it is designed to serve." (*People* v. *Washington, supra,* 62 Cal.2d 777, 783; *People* v. *Phillips, supra,* 64 Cal.2d 574, 582-583.) Accordingly, we conclude that a killing that constitutes murder solely because it resulted from a violation of section 347 is not first degree murder which is perpetrated by means of poison within the meaning of Penal Code section 189.

Defendant also makes numerous other contentions none of which are meritorious. He first contends that the evidence was insufficient to support the verdict. ■ The test on appeal is not whether there are inferences consistent with innocence, but whether there is substantial evidence to support the verdict. (*People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].) ■ The facts set forth at the beginning of this opinion clearly support the hypothesis that defendant furnished

methyl alcohol to decedent in violation of section 347 and that decedent died as a result of drinking the alcohol.

Defendant next contends that the admission into evidence of a certain newspaper article constituted prejudicial error. The article stated that defendant was charged with furnishing decedent methyl alcohol and that prisoners would be the key prosecution witnesses. Two inmates had given statements prior to trial regarding certain inculpatory statements made by defendant, but both purported not to remember these statements during their testimony. The article was introduced in an attempt to establish that the losses of memory were feigned. The article had been posted on the prison bulletin board, and the prosecution wished to show that the witnesses were intimidated by the possibility of retaliation from other inmates who had read about their involvement in the trial. The record reflects that the article did not contain any prejudicial or inflammatory statements. Moreover, the jury was instructed to consider only the fact that such an article was published to the extent that it impeached the testimony of the two witnesses and not for the truth of the statements contained therein.

The court also admitted a dying declaration by decedent to the effect that defendant had given him the alcohol and that he did not want defendant "to get away with it." Defendant now claims that the court committed error by determining the admissibility of the dying declaration in the presence of the jury. Evidence Code section 402, subdivision (b), however, gives the court discretion to decide the admissibility of such evidence within the presence of the jury.

Defendant next contends that a proper foundation was not laid for the admission into evidence of a bottle of urine. We need not set forth all the testimony of numerous doctors and laboratory technologists which indicate that it was decedent's urine. We conclude that a sufficient chain of evidence was established so that admission of the bottle of urine was proper.

The prosecution attempted to establish that there was possible hostility between defendant and decedent or between decedent and other inmates in order to show that someone may have had a motive for wanting to kill decedent. Defendant contends that it was prejudicial to allow the prosecution to pursue this line of questioning. It was entirely proper, however, for the prosecution to attempt to establish a motive for the killing. In any event, the attempt to do so could not have been prejudicial to defendant because the prosecution later conceded that the evidence as finally developed was weak and wholly insufficient to show that defendant had any wish to kill decedent.

■ Defendant's final contention is that the trial court erroneously denied his motion for a new trial on the grounds of newly discovered evidence. The newly discovered evidence consisted of the declaration of a fellow inmate who stated that he had drunk one-third of a 5-inch cup from which decedent had also been drinking. He further stated that decedent had told him that he received a bottle of the liquid every week from a person named "Lanny or Lonnie." We do not believe that this evidence would have rendered a different result reasonably probable, and we find no abuse of discretion in the denial of the motion. (*People* v. *Williams* (1962) 57 Cal.2d 263, 270 [18 Cal.Rptr. 729, 368 P.2d 353]; *People* v. *Huskins* (1966) 245 Cal.App.2d 859, 862 [54 Cal.Rptr. 253].)

The judgment is affirmed.

McComb, J., Peters, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.