[No. B180922. Second Dist., Div. Three. Apr. 16, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
BOB BEJARANO, Defendant and Appellant.

COUNSEL

Irma Castillo, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson and Pamela C. Hamanaka, Assistant Attorneys General, Joseph P. Lee and James William Bilderback II, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

### KITCHING, J.—

## I. INTRODUCTION

The issue in this case is whether the merger doctrine articulated in *People v. Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580] (*Ireland*), and its progeny apply in this case. Here we must decide whether the trial court erroneously instructed the jury that appellant could be convicted of second degree felony murder based on the underlying or "predicate" felony of discharging a firearm at an occupied motor vehicle (Pen. Code, § 246).[1] The facts of this case show that appellant discharged the firearm once, intending to shoot the motor vehicle's occupants, rival gang members, and not intending merely to frighten them. The bullet, however, struck and killed an unintended victim, the driver of another vehicle. For the reasons stated below, we find the trial court reversibly erred.[2]

■ In *Ireland*, our Supreme Court adopted the merger doctrine, holding that the trial court erred by instructing a jury on second degree felony murder based on the felony of assault with a deadly weapon (§ 245), because the felony merged with the resulting homicide. Most recently, in *People v. Randle* (2005) 35 Cal.4th 987 [28 Cal.Rptr.3d 725, 111 P.3d 987] (*Randle*), our Supreme Court held that the trial court erred by instructing on second degree felony murder because the felony of discharging a firearm in a grossly negligent manner, in violation of section 246.3, merged with the resulting homicide. *Randle* found merger because the defendant admitted shooting at the decedent. Based on *Randle*, we hold the trial court in the present case erred by instructing the jury on second degree felony murder based on the felony of discharging a firearm at an occupied motor vehicle in violation of section 246, because appellant admitted he shot at, and intended to shoot, the rival gang members. Appellant had no collateral and independent felonious purpose. We conclude the error was prejudicial because the People have failed to show that no juror relied on the erroneous instruction as the sole basis for finding appellant guilty of second degree murder.

Bob Bejarano appeals from the judgment entered following his convictions by jury on count 1—second degree murder (§ 187) with personal use of a

---

[1] That section states, in relevant part, "Any person who shall maliciously and willfully discharge a firearm at an . . . occupied motor vehicle, . . . is guilty of a felony . . . ." (Pen. Code, § 246.) Subsequent statutory references are to the Penal Code.

[2] As noted below, respondent does not dispute that, under the transferred intent doctrine, appellant's intent to shoot the rival gang members transferred to the otherwise unintended victim with the result that appellant feloniously assaulted the latter, killing him.

firearm (§ 12022.53, subd. (b)), personal and intentional discharge of a firearm (§ 12022.53, subd. (c)), and personal and intentional discharge of a firearm causing death (§ 12022.53, subd. (d)), and count 2—discharging a firearm at an occupied motor vehicle (§ 246) with personal and intentional discharge of a firearm causing death (§ 12022.53, subd. (d)), and with findings that each offense was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(A)). The court sentenced him to prison for 40 years to life.

## II. FACTUAL SUMMARY

### A. People's Evidence.

Viewed in accordance with the usual rules on appeal (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103]), the evidence established that on the evening of August 28, 2003, Merced Ramirez, who worked for a construction company, was driving his Honda when he was shot near San Fernando Road and Roxford Drive in Los Angeles. A bullet shattered the Honda's rear window and entered the back of Ramirez's head, killing him. The Honda crashed and ultimately stopped about 520 feet from appellant's driveway.

In February 2004, appellant told Los Angeles police detectives several different stories about the crash. Appellant said he remembered the car crash that occurred by his house during the previous summer. He initially indicated to police that he was asleep at home at the time of the crash, and his father went to the crash site and told appellant about it the next day. Appellant later indicated to police that at the time of the crash he was in the shower listening to the radio, and his father later told him about the crash. Appellant also said that on the evening of the crash, he was drinking with his father and his brother Pedro. Appellant initially denied membership in a local gang but indicated Pedro was a gang member.

During the same interview, appellant later told police he was a gang member. Two rival gang members drove up in an Oldsmobile, claimed their gang, and looked at appellant. Appellant ran inside the house.

Appellant told police that he later went outside. The Oldsmobile was gone. Appellant initially denied talking with anyone in the Oldsmobile. Appellant told police that he was drunk. He later admitted arguing with the Oldsmobile's occupants, but claimed he did so when he fled in the house.

Still later, during the same interview, appellant told police that what really happened was as follows. Appellant and others were outside his house and

appellant argued with a male in a black Oldsmobile. The Oldsmobile's occupants were yelling their gang name. Although he did not see a gun, appellant became angry because he guessed the people in the Oldsmobile were going to shoot him, and appellant testified that he "put . . . the gun at him." (*Sic.*) Appellant, on the sidewalk in front of his home, pointed the gun at the Oldsmobile after it left, and the gun went off once. The Oldsmobile was "far" from appellant at the time, probably on San Fernando Road and Roxford Drive.

Appellant did not see the bullet hit the Oldsmobile, which contained two people. When the gun discharged, there was no one else close to appellant. When the Oldsmobile was driving away from appellant, he could not see what its occupants were doing.

Appellant admitted to police that he shot at the Oldsmobile and was shooting at the "gangsters." Appellant did not intend to shoot the decedent, but intended to shoot the "gangsters." Appellant did not know that he was the person who shot the decedent. Appellant testified it was dark when the shooting occurred, and the only streetlight was on the corner of San Fernando Road and Roxford Drive.

During the same interview, in a later written statement to police, appellant wrote, inter alia, as follows. On the day of the car crash he was outside his house by himself. He was frightened by gang members "that had drove [*sic*] by my house when I mistakenly pulled the trigger and the gun went off." A gang expert testified that appellant and the gang members from the Oldsmobile were from rival criminal gangs.

### B. *Defense Evidence.*

Appellant's defense was that Pedro, not appellant, was the shooter. In pertinent part, appellant testified as follows. Appellant arrived home from work about 3:00 p.m. on August 28, 2003. Appellant drank beer with his father. Between 7:00 p.m. and 9:00 p.m., appellant was in the driveway of his home. Appellant never had a gun that night.

Appellant testified that between 8:00 p.m. and 9:00 p.m., he heard a gunshot. He saw an Oldsmobile pass and saw Pedro outside. Pedro fired once at the Oldsmobile. Appellant told police that appellant was the shooter because he did not want Pedro to go to jail. Appellant wrote a statement to police because police threatened to take his father and brother to jail, and police told appellant that if he admitted the crime he would go home. Appellant told police that Pedro was the shooter, but officers indicated they did not want to hear that information. Appellant did not consider himself to be a gang member, but Pedro and his friends were gang members.

## III. *CONTENTIONS*

Appellant contends, inter alia, that the trial court erred by instructing the jury on second degree felony murder based on the felony of discharging a firearm at an occupied motor vehicle.

## IV. *DISCUSSION*

*We Conclude That the Trial Court Erred by Instructing on Second Degree Felony Murder, and Therefore the Second Degree Murder Conviction Must Be Reversed.*

### A. *Pertinent Facts Regarding Trial Proceedings.*

The second amended information alleged, inter alia, that appellant committed murder (count 1) and shooting at an occupied motor vehicle (count 2). After the presentation of evidence, the court instructed the jury, inter alia, on murder based on malice aforethought and based on felony murder predicated on the felony of discharging a firearm at an occupied motor vehicle. The court also instructed the jury on malice aforethought and express and implied malice (CALJIC No. 8.11).[3]

The court further instructed the jury on first degree willful, deliberate, and premeditated murder, second degree unpremeditated murder, second degree murder based on implied malice, and second degree felony murder based on discharging a firearm at an occupied motor vehicle (§ 246).

During jury argument, the prosecutor argued, inter alia, that appellant was liable for second degree murder under an implied malice theory and under a felony-murder theory based on the felony of discharging a firearm at an occupied motor vehicle. The prosecutor also argued that second degree felony murder could include an accidental killing, and read to the jury the felony-murder instruction (CALJIC No. 8.32) that indicated the killing could be unintentional or accidental. The jury convicted appellant as previously indicated.

---

[3] The written CALJIC No. 8.11 instruction given to the jury stated: " 'Malice' may be either express or implied. [¶] Malice is express when there is manifested an intention unlawfully to kill a human being. [¶] Malice is implied when: [¶] 1. The killing resulted from an intentional act; [¶] 2. The natural consequences of the act are dangerous to human life; and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life."

B. *Analysis.*

We review below the progression of California Supreme Court jurisprudence regarding the second degree felony-murder rule from *Ireland* to *Randle* and find that the merger principles articulated in those cases control this case.

1. *Pertinent Law.*

a. *The Felony-murder Rule.*

A homicide that is a direct causal result of the commission of a felony that is inherently dangerous to human life (other than a felony enumerated in § 189) is at least second degree murder. (*People v. Howard* (2005) 34 Cal.4th 1129, 1135 [23 Cal.Rptr.3d 306, 104 P.3d 107].)

In *People v. Robertson* (2004) 34 Cal.4th 156 [17 Cal.Rptr.3d 604, 95 P.3d 872] (*Robertson*), our Supreme Court stated the following concerning the felony-murder rule: "The felony-murder rule eliminates the need for proof of malice in connection with a charge of murder, thereby rendering irrelevant the presence or absence of actual malice, both with regard to first degree felony murder and second degree felony murder. [Citations.]" (*Id.* at p. 165.) *Robertson* later stated, "A principal purpose of the felony-murder rule is deterrence. Case law has emphasized the need to deter the commission of felonies that put human life at risk [citations], and also the need to deter persons who commit such felonies from committing negligent or accidental killings in the course of these felonies. [Citations.] [¶] The first degree felony-murder rule is a creation of statute. (§ 189.) The second degree felony-murder rule is a common law doctrine. In the case of a second degree felony-murder charge, the inherent danger to human life posed by the defendant's unlawful conduct serves to justify the conclusion that proof of actual malice should not be required. . . . [¶] The second degree felony-murder doctrine is limited to inherently dangerous felonies because, in the absence of such danger, it would be less justifiable to remove the element of malice from the prosecutor's burden of proof." (*Robertson*, at pp. 165–166.)

b. *Ireland: the Merger Rule.*

Prior to *Ireland*, the "merger" doctrine developed in other jurisdictions as a shorthand explanation for the conclusion that the felony-murder rule should not be applied in circumstances where the only predicate felony committed by the defendant was assault. (*People v. Hansen* (1994) 9 Cal.4th 300, 311 [36 Cal.Rptr.2d 609, 885 P.2d 1022] (*Hansen*).) "The name of the doctrine derived from the characterization of the assault as an offense that 'merged' with the resulting homicide." (*Ibid.*)

In *Ireland,* the California Supreme Court discussed the merger rule. In that case, a husband shot his wife, and the court instructed on second degree felony murder based on the predicate felony of section 245, assault with a deadly weapon. The court refused to extend the second degree felony-murder rule to that case because it would extend the rule beyond any rational purpose it was intended to serve. The court stated: "To allow such use of the felony-murder rule would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of a felonious assault—a category which includes the great majority of all homicides." (*Ireland, supra,* 70 Cal.2d at p. 539.) The court concluded that a trial court may not instruct the jury with second degree felony murder when the instruction is "based upon a felony which is an integral part of the homicide and which the evidence produced by the prosecution shows to be an offense included *in fact* within the offense charged." (*Ibid.*)

In *Ireland,* the predicate felony (that is, the felony the trial court instructed the jury they could rely on to convict the defendant of second degree felony murder) was section 245. The cases below discuss the merger rule in contexts in which the predicate felony was not expressly referred to as a violation of section 245, although, in one such case, the predicate felony was, in effect, felonious assault.

### c. Mattison.

In *People v. Mattison* (1971) 4 Cal.3d 177 [93 Cal.Rptr. 185, 481 P.2d 193] (*Mattison*), the Supreme Court relied on *People v. Taylor* (1970) 11 Cal.App.3d 57 [89 Cal.Rptr. 697] (*Taylor*),[4] to formulate a new test with regard to the *Ireland* merger rule. The court found the *Ireland* merger rule did not apply and the defendant could be convicted of second degree felony murder based on the predicate felony of a violation of section 347, because he committed the predicate felony with a collateral and independent felonious design. When a defendant intends to commit the very assault which results in death, such as when death results from the commission of assault with a deadly weapon, the *Ireland* merger rule applies. However, when the defendant has a collateral and independent purpose in committing the predicate felony, the *Ireland* merger rule does not apply and the defendant may be convicted of second degree felony murder.

In *Mattison,* the defendant caused the death of a fellow prisoner by furnishing poisonous methyl alcohol to him. The defendant did not intend to kill the decedent; rather, he furnished the substance for financial gain, an

---

[4] *Taylor* involved the furnishing of heroin which caused the death of the victim.

independent .and collateral purpose. Thus, he could be convicted of second degree felony murder. The court noted the independent and collateral purpose rule furthered the purpose of the felony-murder rule. The court stated, " '[w]hile the felony-murder rule can hardly be much of a deterrent to a defendant who has decided to assault his victim with a deadly weapon, it seems obvious that in the situation presented in the case at bar, it does serve a rational purpose: knowledge that the death of a person to whom heroin is furnished may result in a conviction for murder should have some effect on the defendant's readiness to do the furnishing.' " (*Mattison, supra,* 4 Cal.3d at p. 185, quoting *Taylor, supra,* 11 Cal.App.3d at p. 63.)

### d. Smith.

*People v. Smith* (1984) 35 Cal.3d 798 [201 Cal.Rptr. 311, 678 P.2d 886] (*Smith*), extended the *Ireland* merger rule to a case in which the predicate felony was felony child abuse in violation of section 273a. Our Supreme Court noted that a defendant may be convicted of section 273a due to active conduct, i.e., child abuse by direct assault, and passive conduct, i.e., child endangering by extreme neglect. In *Smith*, the child died because of direct assault. The court stated: "In the present case the homicide was the result of child abuse of the assaultive variety. Thus, the underlying felony was unquestionably an 'integral part of' and 'included in fact' in the homicide within the meaning of *Ireland*." (*Smith*, at p. 806.) The court noted there was no independent purpose for the conduct and, like *Ireland*, "the purpose here was the very assault that resulted in death."

*Smith* noted, "The elements of section 245 and the offense here are strikingly similar; the principal difference is that the assault prohibited by section 273a is committed on a child." (*Smith, supra,* 35 Cal.3d at p. 807, fn. omitted.) The court earlier noted that the felony-murder rule is a disfavored doctrine and should be interpreted narrowly " 'consistent with its ostensible purpose—which is to deter those engaged in felonies from killing negligently or accidentally.' " (*Id.* at p. 803.) Importantly, *Smith* also stated, "by its very definition felony child abuse occurs only 'under circumstances or conditions likely to produce great bodily harm or death.' It is untenable to assert that there is an independent design when the crime of felony .child abuse of the assaultive variety is willfully committed under such circumstances." (*Id.* at p. 808.) *Smith* thus applied the merger rule to a situation in which the predicate felony was not expressly referred to as a violation of section 245, but the predicate felony was of the "assaultive variety" (*Smith*, at p. 808).

### e. Hansen.

In *Hansen, supra,* 9 Cal.4th 300, our Supreme Court found that the *Ireland* merger rule did not apply where the predicate felony was discharge of a

firearm at an inhabited dwelling house in violation of section 246. The court found the " 'integral part of the homicide' " (*Hansen*, at p. 314) test of *Ireland* and the independent and collateral purpose test of *Mattison* (*Hansen*, at p. 315) were not dispositive. The court formulated a new test: whether merger would subvert legislative intent.

In *Hansen*, the defendant fired shots at an apartment, unaware that its occupants were children. One of the shots killed one of the children. The defendant admitted to police that he fired several shots at the building. However, he also stated he had been waiting for someone whom he believed had taken his money, he was shooting "at '[j]ust the house' " (*Hansen, supra*, 9 Cal.4th at p. 306), and he would not have done so if he had known there were children inside. (*Ibid.*) At trial, he presented evidence that he was under the influence of alcohol and drugs at the time of the shooting, and he denied remembering firing shots. He testified that, although the lights were on in the apartment, he believed no one was inside because no one had answered when he had knocked on the door. He denied intending to harm anyone. (*Ibid.*)

In *Hansen*, our Supreme Court held that the trial court properly instructed that second degree felony murder could be based on the felony of discharging a firearm at an inhabited dwelling house in violation of section 246.[5] *Hansen* concluded discharging a firearm at an inhabited dwelling qualified as an inherently dangerous felony for purposes of the felony-murder rule, and that the *Ireland* merger rule did not apply. (*Hansen, supra*, 9 Cal.4th at pp. 304, 311, 316.)

*Hansen* said, "In explaining the basis for the merger doctrine, courts and legal commentators reasoned that, because a homicide generally results from the commission of an assault, every felonious assault ending in death automatically would be elevated to murder in the event a felonious assault could serve as the predicate felony for purposes of the felony-murder doctrine. Consequently, application of the felony-murder rule to felonious assaults would usurp most of the law of homicide, relieve the prosecution in the great majority of homicide cases of the burden of having to prove malice in order to obtain a murder conviction, and thereby frustrate the Legislature's intent to punish certain felonious assaults resulting in death (those committed with malice aforethought, and therefore punishable as murder) more harshly than other felonious assaults that happened to result in death (those committed without malice aforethought, and therefore punishable as manslaughter). [Citations.]" (*Hansen, supra*, 9 Cal.4th at pp. 311–312.) The court noted that

---

[5] That section, the same one at issue in the present case, states, as relevant to *Hansen*, "Any person who shall maliciously and willfully discharge a firearm at an inhabited dwelling house . . . is guilty of a felony . . . . [¶] As used in this section, 'inhabited' means currently being used for dwelling purposes, whether occupied or not." (§ 246.)

the *Ireland* merger rule traditionally has not been extended to offenses other than assault. (*Id.* at p. 312.)

As stated, in *Hansen*, our Supreme Court rejected the collateral and independent felonious design test as dispositive. The court stated, "We decline, . . . to adopt as the critical test determinative of merger in all cases the following language that appears in *Taylor*, . . . that the rationale for the merger doctrine does not encompass a felony ' "committed with a collateral and independent felonious design." ' (*People v. Taylor, supra*, 11 Cal.App.3d at p. 63 . . . .)" (*Hansen, supra*, 9 Cal.4th at p. 315.) The court continued, "Under such a test, a felon who acts with a purpose other than specifically to inflict injury upon someone—for example, with the intent to sell narcotics for financial gain, or to discharge a firearm at a building solely to intimidate the occupants—is subject to greater criminal liability for an act resulting in death than a person who actually intends to injure the person of the victim. Rather than rely upon a somewhat artificial test that may lead to an anomalous result, we focus upon the principles and rationale underlying the foregoing language in *Taylor*, namely, that with respect to certain inherently dangerous felonies, their use as the predicate felony supporting application of the felony-murder rule will not elevate all felonious assaults to murder or otherwise subvert the legislative intent." (*Ibid.*)

The Supreme Court finally observed that "application of the second degree felony-murder rule would not result in the subversion of legislative intent," because "[m]ost homicides do not result from violations of section 246, and thus, unlike the situation in [*Ireland*], application of the felony-murder doctrine in the present context will not have the effect of 'preclud[ing] the jury from considering the issue of malice aforethought . . . [in] the great majority of all homicides.' [Citation.] Similarly, application of the felony-murder doctrine in the case before us would not frustrate the Legislature's deliberate calibration of punishment for assaultive conduct resulting in death, based upon the presence or absence of malice aforethought. . . . [A]pplication of the felony-murder rule, when a violation of section 246 results in the death of a person, clearly is consistent with the traditionally recognized purpose of the second degree felony-murder doctrine—namely the deterrence of negligent or accidental killings that occur in the course of the commission of dangerous felonies." (*Hansen, supra*, 9 Cal.4th at p. 315.)

### f. Robertson.

■ *Robertson* again relied on the collateral purpose rationale. In that case, our Supreme Court stated: "Although the collateral purpose rationale may have its drawbacks in some situations (*Hansen, supra*, 9 Cal.4th at p. 315), we believe it provides the most appropriate framework to determine

whether, under the facts of the present case, the trial court properly instructed the jury." (*Robertson, supra,* 34 Cal.4th at p. 171.) In *Robertson,* our Supreme Court found the jury could be instructed on second degree felony murder based on the predicate felony of discharging a firearm in a grossly negligent manner in violation of section 246.3,[6] where the defendant had the collateral purpose of frightening persons away.

In *Robertson,* the defendant shot and killed a man who was burglarizing his vehicle. The defendant told various stories to the police. Initially he denied he was involved in any shooting. Eventually he told the police that he found men burglarizing his vehicle and he fired two warning shots at a 45-degree angle. He also told the police he fired three shots at the fleeing burglars. He denied that he intended to hit the men and claimed he meant only to scare them. A neighbor testified that the neighbor saw a person "standing in a 'firing stance' in the street, firing shot after shot straight ahead and on each occasion correcting for the weapon's 'kickback.' " (*Robertson, supra,* 34 Cal.4th at p. 162.)

Our Supreme Court found the defendant's asserted purpose in firing the gun was to frighten away the men burglarizing his vehicle. Since this was a purpose collateral to the resulting homicide, the second degree felony-murder instruction was proper. The court concluded that permitting a violation of section 246.3 to serve as the predicate felony served a deterrent purpose. The court stated: "In view of the reasonable foreseeability of the risk of injury or death [for intentionally discharging a firearm], knowledge that punishment for second degree felony murder may ensue if a death occurs may deter individuals from illegally discharging a firearm—whether they are contemplating doing so in order to celebrate a festive occasion or for some other purpose such as to frighten away persons who do not present what a reasonable person would consider a threat of imminent harm to the defendant." (*Robertson, supra,* 34 Cal.4th at p. 171.) The court found that the second degree felony-murder rule was well established, and refused to restrict the felony-murder rule by expanding the merger doctrine. (*Id.* at p. 173.)

g. Randle.

In *Randle,* our Supreme Court again considered the independent and collateral purpose rule when determining if the *Ireland* merger rule applied. The court concluded the *Ireland* merger rule applied when the predicate felony was discharge of a firearm in a grossly negligent manner in violation of section 246.3, where the defendant admitted shooting at the decedent. That

---

[6] That section states, in relevant part, "any person who willfully discharges a firearm in a grossly negligent manner which could result in injury or death to a person is guilty of a public offense . . . ." (§ 246.3, subd. (a).)

is, it appeared the defendant intended to commit the assault that resulted in death. Our Supreme Court stated, "defendant admitted shooting at [the victim]. Therefore, the collateral purpose exception to the merger doctrine is inapplicable. [Citation.]" (*Randle, supra,* 35 Cal.4th at p. 993.)

In *Randle,* the defendant and an accomplice, Byron W. (Byron) burglarized a car belonging to Charles Lambert, the cousin of the decedent Brian Robinson. When Robinson confronted the burglars in the act, the defendant fired a gun several times. The burglars fled, Byron retaining the contraband. (*Randle, supra,* 35 Cal.4th at p. 991.) During the events that followed, the defendant killed Robinson.

Specifically, Robinson and Lambert entered a truck, pursued, caught, and beat Byron, and recovered the contraband. Robinson and Lambert reentered the truck, but Robinson later exited and continued beating Byron. Byron, the defendant's cousin, testified an assailant was beating him when the defendant yelled, " 'Get off my cousin' " (*Randle, supra,* 35 Cal.4th at p. 992). The assailant continued beating Byron, then the "defendant opened fire." (*Ibid.*)

The defendant testified that after he initially fled, he began searching for Byron. The defendant heard someone yelling for help and someone else saying he was going to kill a person. Coming closer, the defendant saw someone beating Byron. The defendant shouted, " 'Stop. Get off my cousin.' " (*Randle, supra,* 35 Cal.4th at p. 992.) The assailant glanced at the defendant, but resumed beating Byron. The defendant testified he fired his gun to make the assailant stop beating Byron.

The defendant made two statements, one to police and one to a prosecutor, and both statements were introduced into evidence. In his statement to police, the defendant stated Robinson was beating Byron when the defendant first shot at Robinson. According to the defendant, he was mainly thinking about getting Robinson off Byron. However, the defendant also told police that he shot at Robinson after Robinson started running away. In his statement to a prosecutor, the defendant said he warned Robinson to get off Byron and shot once in the air, and then when Robinson did not respond, shot at him. However, the defendant also told the prosecutor that the defendant shot at Robinson while he was running away. (*Randle, supra,* 35 Cal.4th at p. 992.)

Apart from the defendant's statements, witnesses' testimony provided evidence that the defendant shot Robinson. (*Randle, supra,* 35 Cal.4th at p. 992.) The witnesses' testimony corroborated the defendant's above mentioned statements that he shot at Robinson as Robinson was running away. (*Ibid.*) Robinson died as a result of a bullet entering his lower chest or upper abdomen and lodging in his abdomen. Robinson was not wounded in the

back. (*Id.* at p. 993.) A jury convicted the defendant of second degree murder and automobile burglary. (*Ibid.*)

The central question in *Randle* was whether the defendant could assert a defense of imperfect defense of others. (*Randle, supra,* 35 Cal.4th at p. 990.) *Randle* concluded he could, and affirmed the appellate court judgment, which had reversed the trial court judgment solely as to the second degree murder conviction on the ground the trial court erroneously had refused to instruct on that defense. (*Id.* at pp. 993, 1006.) However, *Randle* also addressed an issue pertinent here, namely, whether the trial court erred by instructing the jury that the defendant could be found guilty of second degree felony murder based on the felony of discharging a firearm in a grossly negligent manner in violation of section 246.3.[7] (*Randle,* at p. 993.)

In *Randle* (as in the present case) the jury instructions permitted the jury to convict the defendant of second degree murder on three theories: express malice, implied malice, and felony murder. (*Randle, supra,* 35 Cal.4th at p. 1004.) In *Randle,* the defendant contended the trial court erred by instructing on felony murder because the offense of discharging a firearm in a grossly negligent manner merged with the homicide. (*Ibid.*)

*Randle* stated, "Here, unlike *Robertson,* defendant admitted, in his pretrial statements to the police and to a deputy district attorney, he shot *at* Robinson. . . . [¶] The fact that defendant admitted shooting at Robinson distinguishes *Robertson* and supports application of the merger rule here." (*Randle, supra,* 35 Cal.4th at p. 1005.)

We note that in *Randle,* although the defendant fired multiple shots, the *sole* discharge of a firearm in a grossly negligent manner that resulted in Robinson's *death* for purposes of second degree felony murder occurred when the defendant shot *at* him. The defendant admitted that he committed the section 246.3 violation solely by shooting at the victim, that is, he appeared to intend to commit the injury resulting in death. Thus, the *Randle* court held the merger rule applied.

### h. *Standard of Prejudice.*

If a trial court erroneously instructs on felony murder, we reverse the judgment unless the error was harmless beyond a reasonable doubt. (Cf. *Smith, supra,* 35 Cal.3d at p. 808; *People v. Wilson* (1969) 1 Cal.3d 431, 438, 443 [82 Cal.Rptr. 494, 462 P.2d 22]; *Ireland, supra,* 70 Cal.2d at pp. 538–540; *People v. Chavez* (2004) 118 Cal.App.4th 379, 387 [12 Cal.Rptr.3d 837];

---

[7] See footnote 6, *ante.*

*Neder v. United States* (1999) 527 U.S. 1, 8–20 [144 L.Ed.2d 35, 119 S.Ct. 1827].) That standard of prejudice, applied to instructional error of the type at issue here, requires reversal unless the People "show that no juror relied on the erroneous instruction as the *sole* basis for finding defendant guilty of murder." (*Smith, supra*, 35 Cal.3d at p. 808, italics added.) It follows that if the jury reasonably could have convicted appellant of second degree murder based on felony murder and not express or implied malice, we reverse.

### 2. *Application of the Law to This Case.*

#### a. *The Felony-murder Instruction Was Erroneous.*

There is no dispute that the trial court properly instructed the jury on the second degree felony-murder rule only if the jury could find appellant guilty of second degree felony murder based on the felony of discharging a firearm at an occupied motor vehicle, that is, the Oldsmobile. Similar to the case in *Randle*, appellant admitted to police that he shot at the occupants of the Oldsmobile. He thereby admitted that he committed assault with a firearm against the occupants. Indeed, appellant admitted not merely that he shot at someone, but that he intended to do so. Thus, he had no collateral purpose in shooting at the occupants of the Oldsmobile. As in *Randle*, the fact that appellant admitted shooting at the rival gang members in the Oldsmobile distinguishes *Robertson*.[8] The felony-murder rule can hardly be much of a deterrent to a defendant who has decided to discharge a firearm at an occupied motor vehicle solely with an intent to thereby assault the occupants. Thus, *Randle* controls this case, the predicate felony merged with the homicide, and the trial court erred in instructing the jury on second degree felony murder based on discharging a firearm at an occupied motor vehicle in violation of section 246.

#### b. *The Instructional Error Was Prejudicial.*

The remaining issue is whether the instructional error was prejudicial. As mentioned, the trial court instructed on express and implied malice (see fn. 3, *ante*). In particular, as to implied malice, the court instructed that malice was implied when the killing resulted from an intentional act, the natural consequences of the act were dangerous to life, and the act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. For the reasons discussed below, the evidence in this case did not

---

[8] Respondent does not dispute appellant's assertion that, under the transferred intent doctrine, his intent to shoot the gangsters transferred to Ramirez with the result that appellant feloniously assaulted Ramirez, killing him. (See *Smith, supra*, 35 Cal.3d at pp. 803–805; *People v. Sears* (1970) 2 Cal.3d 180, 188–189 [84 Cal.Rptr. 711, 465 P.2d 847].)

establish express or implied malice as a matter of law, and the jury reasonably could have relied on the felony-murder theory alone to convict appellant of second degree murder.

In this case, the primary source of incriminating evidence was appellant's statements when police interviewed him. Although those statements contained information that was sometimes conflicting, those statements and the People's case-in-chief put the following evidence before the jury. The shooting occurred at night. There were no streetlights in front of appellant's house. The only streetlight was on the corner of San Fernando Road and Roxford Drive, and the distance from appellant's driveway to the west side of San Fernando at that intersection was 322 feet. Appellant denied that when he pointed the gun at the Oldsmobile and the gun discharged, the Oldsmobile was illuminated by the light at San Fernando Road and Roxford Drive.

Appellant admitted that he pointed his gun at the Oldsmobile's occupants and intended to shoot them. However, there was also evidence he pointed the gun at the Oldsmobile after it left and then the gun discharged. There was no evidence that he carefully aimed at the Oldsmobile's occupants when he fired. Appellant at one point told police he mistakenly pulled the gun's trigger and the gun *went off.* He denied pointing at the Oldsmobile and following it as it drove away. Appellant fired not multiple shots, which would have increased the risk of injury, but a single shot.

There were only two people in the Oldsmobile. No evidence was presented as to how they were seated, e.g., whether they were seated upright or ducking at the time appellant fired. At one point appellant told police the occupants "went down" and yelled. Appellant also told police that when the Oldsmobile was driving away from him, he could not see what its occupants were doing. No evidence was presented as to how the Oldsmobile drove away on Roxford, whether straight or evasively. At one point appellant told police that when the gun discharged, the Oldsmobile was "far" from appellant, probably on San Fernando and Roxford. No evidence was presented at trial concerning the caliber of the bullet that killed Ramirez. No evidence was presented that the bullet hit the Oldsmobile.

Appellant denied anyone else was close to him when the gun discharged, denied there were neighbors "out there," and denied there was anyone else around whom he could see. Appellant acknowledged generally that many cars passed through his neighborhood, but he did not state that that was the case at the time of the shooting. He indicated he saw cars driving on Roxford Drive at the time of the incident, but it was unclear from his statement where those cars were in relation to the Oldsmobile. There was evidence that appellant had been drinking. Appellant told police he was drunk.

Moreover, no evidence was presented as to the lighting in the area of where Ramirez's Honda came to rest, which was about one-tenth of a mile from appellant's driveway. No clear evidence was presented as to whether there was any pedestrian or vehicular traffic between the Oldsmobile and Ramirez, whether appellant was aware of any such traffic, or whether appellant was aware of Ramirez or his vehicle. Appellant denied intending to shoot Ramirez.

 As mentioned, one difference between implied malice murder and felony murder is that implied malice requires that the defendant deliberately perform the act with *knowledge* of the danger to, and with *conscious* disregard for, human *life*. Given the subjective mental component of implied malice and the above recited facts, a jury reasonably could have concluded that the issue of whether appellant harbored malice (express or implied) was not reasonably free from dispute. Accordingly, the jury reasonably could have convicted appellant of second degree murder based on a felony-murder theory and not malice, either because convicting him on the less demanding theory of felony murder made it unnecessary to reach the issue of whether appellant harbored malice, or because the jury actually entertained a reasonable doubt that he harbored malice.

We also note that the section 186.22, subdivision (b)(1)(A) criminal street gang finding[9] is not helpful on this issue, since that finding was consistent with either an implied malice theory or felony-murder theory of second degree murder, and nothing in that finding was inconsistent with the jury convicting appellant of second degree murder based solely on felony murder theory.

The People have not proven that the jury did not rely on the erroneous instruction as the sole basis to convict appellant of second degree murder. In this difficult area of the law, and in light of the facts of this case, we are compelled by *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937], to follow *Randle*. Accordingly, we must reverse the judgment as to appellant's conviction for second degree murder

---

[9] Section 186.22, subdivision (b)(1) states, in relevant part, "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished as follows . . . ."

(cf. *Smith, supra,* 35 Cal.3d at p. 808; *Randle, supra,* 35 Cal.4th at p. 1006; *People v. Chavez, supra,* 118 Cal.App.4th at p. 387) and remand the matter for retrial (§ 1262).[10]

## V. *DISPOSITION*

The judgment is affirmed, except that the judgment of conviction for second degree murder is reversed.

Klein, P. J., and Croskey, J., concurred.

On May 3, 2007, the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied June 20, 2007, S152570.

---

[10] None of the cases cited by respondent, or respondent's argument, compels a contrary conclusion. This includes *People v. Tabios* (1998) 67 Cal.App.4th 1 [78 Cal.Rptr.2d 753]. *Tabios* did not discuss whether the defendant had a collateral and independent felonious purpose. Nor did *Tabios* discuss the issue ultimately decided in *Randle.* Moreover, in *Tabios,* the defendants, in effect, merely contended that when the predicate felony is a violation of section 246, the predicate felony *always* merges with a resulting homicide, apart from how the predicate felony is committed, and *Tabios* rejected that contention. Finally, *Hansen* was the sole case upon which *Tabios* relied to reject application of the merger rule. In *Hansen,* unlike the present case, there was no evidence that the defendant intended to commit an assault.

In light of our above discussion, there is no need to address appellant's remaining contentions. We note some are based on trial evidence which may be different in the event of a retrial.