69 Cal.Rptr.3d 132 (2007)
157 Cal.App.4th 580
The PEOPLE, Plaintiff and Respondent,
v.
Melvin J. JONES, Defendant and Appellant.
No. B189056.
Court of Appeal of California, Second District, Division Eight.
December 3, 2007.
As Modified December 21, 2007.
*136 Joanna McKim, under appointment by the Court of Appeal, San Diego, for Defendant and Appellant.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Lance E. Winters, Deborah J. Chuang and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.
RUBIN, J.
Defendant and appellant Melvin J. Jones appeals from his conviction of second degree felony murder, attempted murder, assault with a semi-automatic firearm and shooting at an occupied motor vehicle.[1] He contends: (1) the conviction for second degree murder must be reversed; (2) there were various instructional errors; (3) the trial court erred in admitting evidence of defendant's post-arrest conduct; (4) even if individually harmless, the errors were cumulatively prejudicial; and (5) there were sentencing errors. We modify the judgment and affirm as modified.

FACTUAL BACKGROUND

A. Prosecution's Evidence

Viewed in accordance with the usual rules on appeal (People v. Kraft (2000) 23 Cal.4th 978, 1053, 99 Cal.Rptr.2d 1, 5 P.3d 68), the evidence established that defendant was one of about 200 members of the criminal street gang known as the Tiny Rascals Gang (TRG). Defendant was one of three or four African-American members of TRG; about 90 percent of the members are Cambodian. TRG's primary rivals are Hispanic gangs, which are known as "Eses." A Latino gang member may be referred to as a "Longo."
On Sunday, June 22, 2003, Patricia Miller was driving her 12 year-old son, Michael, to a laundromat. As she was turning the car around on 15th Street, Michael saw a Black male wearing a "black outfit" and something on his head stand directly in front of their car, aim a gun and fire at them. Michael was shot in the left shoulder; his mother was fatally wounded. Michael told the police that he would not be able to identify their assailant. When Michael was subsequently shown a photograph of defendant, he said that his assailant had darker skin.
That day, TRG member Sothun Phuong, who worked part-time in a City of Long Beach community outreach program targeted *137 at gangs, was having a barbeque at his home on Orange Street. Defendant was among other TRG members in attendance; defendant was the only African-American at the party. At about 8:00 or 9:00 p.m., defendant, Angela Van Phin and Sisouk Saengthavongsok left the party and walked to a nearby house from which defendant retrieved a semi-automatic handgun. As defendant returned to the barbeque, several male Hispanics in a white Saturn drove by. When defendant and his companions were walking down 15th Street, another white car drove by and pulled into a driveway, apparently to turn a round. Defendant and Saengthavongsok opened fire on the car. Defendant and the others ran back to the barbeque, changed clothes and hid the clothes they had been wearing in the garage.
Phuong, who had remained at the barbeque, heard about six gunshots just before seeing defendant come running from the direction of 15th Street. Defendant told Phuong that he had "shot an Ese" and then gave Phuong a gun, which Phuong put in a laundry basket in his closet. Phuong also put a second gun, which he received from another guest at the barbeque, in the laundry basket.
Officer Randy Mohagen of the Long Beach Police Department was dispatched to the shooting at 15th Street and Martin Luther King Boulevard. After attending to the victims, Mohagen walked with a witness to an apartment on Orange Street. There, in the garage, Mohagen found a black sweatshirt; in the pocket of the sweatshirt, he found a grey cap or "do rag" and a bag of potato chips; underneath the sweatshirt, he found a black cap. Subsequent analysis revealed that defendant's fingerprints were on the bag of potato chips and his DNA was on the sweatshirt, the black cap and the grey cap.
The next day, June 23, 2003, Phuong told his supervisor at the gang outreach program that he had two guns at his house: one which had been given to him by defendant and the other by a woman named Ozzie, whose boyfriend had also been at the party. Phuong told his supervisor that, when defendant gave Phuong the gun, defendant said he shot an Ese or a Longo.
The following day, June 24, 2003, Phuong went to the police station accompanied by an attorney. Phuong told the police the same things he had told his supervisor. Phuong testified to the same version of events at defendant's preliminary hearing.
From a laundry basket found in a closet at Phuong's home, police recovered an unloaded Hi-Point nine millimeter C-9 handgun and a SIG-Sauer with 10 live rounds of ammunition in the magazine; both guns were wrapped in a black T-shirt. The Hi-Point smelled like it had been recently fired; the SIG-Sauer did not. A bullet recovered from Michael's shoulder and one recovered from Patricia's body were determined to have been fired by the Hi-Point. The pattern of shell casings found at the scene of the shooting were consistent with having been ejected from the Hi-Point; none of the projectiles could have come from the SIG-Sauer.
When Phin was interviewed by police, she at first falsely stated that defendant and his companions were returning fire on a car full of Hispanics who were shooting at them. Eventually, Phin told the police the truth, that the attack appeared unprovoked.

B. Defendant's Evidence

Alejandro Ocegurera was 10 years old on June 22, 2003. That day, he ducked to the floor upon hearing gunshots. About five seconds later, he looked out a window *138 and saw an Asian-American man with curly hair and wearing a black beanie standing on 15th Street; Ocegurera had only a side view of the man and could not see his face.
That day, Frank Green was standing outside his home on the corner of Orange and 15th Street when he heard gun shots and then saw two Asian-American men and one Asian-American woman run past him and into an apartment building at 14th Street and Orange; Green could not see their faces, but could see their skin color. That evening, the police showed Green a photograph of defendant; Green told them that defendant was not one of the three people he saw running.

C. Prosecution's Rebuttal Evidence

Gerald Abraham Jr. was with Frank Green on June 22, 2003, when they heard gun shots. About half a minute later, Abraham saw defendant "creeping" across the street, crouched down and holding a handgun; defendant was wearing tan pants and a long-sleeved hooded sweatshirt. Abraham, who was able to identify defendant later that evening, never told the police that the shooter was Asian-American.

D. Defendant's Surrebuttal Evidence

According to a police report of the incident taken by a patrol officer, Abraham said there were three Asian-Americans running across the street, one of whom was wearing black pants, a black longsleeved shirt and a black beanie. Also according to the report, Abraham stated that defendant was not the shooter at the field show-up because the shooter was Asian-American.

DISCUSSION

A. Second Degree Felony Murder

As we understand defendant's contention, it is that the conviction for second degree murder must be reversed because, under the merger doctrine first announced in People v. Ireland (1969) 70 Cal.2d 522, 75 Cal.Rptr. 188, 450 P.2d 580 (Ireland), second degree felony murder cannot be based on the predicate felony of shooting at an occupied motor vehicle in violation of section 246. We disagree.
First degree felony murder is defined by section 189 as a murder committed in the perpetration of certain enumerated felonies. Second degree felony-murder rule is a court-made rule which has been defined as follows: "A homicide that is a direct causal result of the commission of a felony inherently dangerous to human life (other than the ... felonies enumerated in Pen.Code, § 189) constitutes at least second degree murder. [Citation.]" (People v. Howard (2005) 34 Cal.4th 1129, 1135, 23 Cal.Rptr.3d 306, 104 P.3d 107.)
The felony-murder rule "eliminates the need for proof of malice in connection with a charge of murder, thereby rendering irrelevant the presence or absence of actual malice, both with regard to first degree felony murder and second degree felony murder. [Citations.]" (People v. Robertson (2004) 34 Cal.4th 156, 165, 17 Cal.Rptr.3d 604, 95 P.3d 872 (Robertson).) Accordingly, the "second degree felony-murder doctrine is limited to inherently dangerous felonies because, in the absence of such danger, it would be less justifiable to remove the element of malice from the prosecutor's burden of proof. [Citations.]" (Robertson, supra, at pp. 165-166, 17 Cal. Rptr.3d 604, 95 P.3d 872.)
In Ireland, supra, our Supreme Court adopted the "merger" doctrine which had been "developed in other jurisdictions as a shorthand explanation for the conclusion *139 that the felony-murder rule should not be applied in circumstances where the only underlying (or `predicate') felony committed by the defendant was assault." (People v. Hansen (1994) 9 Cal.4th 300, 311, 36 Cal.Rptr.2d 609, 885 P.2d 1022 (Hansen).) In Ireland, the court held that it was error to instruct on second degree felony murder based on the crime of assault with a deadly weapon, reasoning that an assault merges with the resulting homicide and cannot form the basis for an application of the felony-murder rule. Without the merger doctrine, a jury would effectively be precluded "from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of felonious assaulta category which includes the great majority of all homicides." (Ireland, supra, 70 Cal.2d at p. 539, 75 Cal.Rptr. 188, 450 P.2d 580.)
In People v. Mattison (1971) 4 Cal.3d 177, 93 Cal.Rptr. 185, 481 P.2d 193 (Mattison), the court held that the Ireland merger doctrine does not apply where the defendant has a collateral and independent purpose in committing the predicate felony. In Mattison, the defendant and victim were fellow prisoners and the victim died as a result of ingesting poisoned methyl alcohol sold to him by the defendant. Finding that the defendant's purpose in violating section 347 [poisoning food or drink], was financial gain, the court in Mattison concluded that the commission of this crime could serve as the predicate felony in a conviction for second degree felony murder because this purpose was collateral and independent from the assault. (Id. at p. 185, 93 Cal.Rptr. 185, 481 P.2d 193.)
Subsequently, in People v. Hansen, supra, 9 Cal.4th 300, 36 Cal.Rptr.2d 609, 885 P.2d 1022, our Supreme Court held that the collateral and independent purpose test articulated in Mattison was not dispositive of the application of the Ireland merger doctrine. (Id. at p. 315, 36 Cal. Rptr.2d 609, 885 P.2d 1022; but see People v. Randle (2005) 35 Cal.4th 987, 1005, 28 Cal.Rptr.3d 725, 111 P.3d 987 (Randle) [despite drawbacks, the collateral purpose rationale provided the most appropriate framework to determine whether, under the facts of that case, the Ireland merger doctrine was applicable].) In Hansen, the defendant gave money to a man to purchase methamphetamine; when the man failed to deliver the drugs, the defendant fired a gun repeatedly into the apartment where the man lived with his family; the man's 13-year-old daughter was fatally wounded. (People v. Hansen, supra, at p. 305, 36 Cal.Rptr.2d 609, 885 P.2d 1022.) In a postarrest interview, the defendant told the police that "he was shooting at `[j]ust the house,' and that he would not have engaged in this conduct had he known `those kids were in there.'" (Id. at p. 306, 36 Cal.Rptr.2d 609, 885 P.2d 1022.) The defendant testified at trial that he did not intend to harm anyone. (Ibid.) He was convicted of second degree felony murder and discharging a firearm at an inhabited dwelling in violation of section 246.[2] (Id. at p. 307, 36 Cal.Rptr.2d 609, 885 P.2d 1022.) Our Supreme Court rejected the defendant's contention that the Ireland merger doctrine precluded using violation of section 246 as a predicate felony for second degree felony murder. It reasoned: "Most homicides do not result from violations of section 246, and thus, unlike the situation in [Ireland], application of the felony-murder doctrine in the present context will not have the effect of `precluding] *140 the jury from considering the issue of malice aforethought ... [in] the great majority of all homicides.' [Citation.] Similarly, application of the felony-murder doctrine in the case before us would not frustrate the Legislature's deliberate calibration of punishment for assaultive conduct resulting in death, based upon the presence or absence of malice aforethought.... [T]his is not a situation in which the Legislature has demanded a showing of actual malice (apart from the statutory requirement that the firearm be discharged `maliciously and willfully') in order to support a second degree murder conviction. Indeed, ... application of the felony-murder rule, when a violation of section 246 results in the death of a person, clearly is consistent with the traditionally recognized purpose of the second degree felony-murder doctrinenamely the deterrence of negligent or accidental killings that occur in the course of the commission of dangerous felonies." (Id. at p. 315, 36 Cal.Rptr.2d 609, 885 P.2d 1022.)
Here, as in Hansen, the predicate felony for second degree felony murder was violation of section 246 and the jury was accordingly instructed with CALJIC Nos. 8.10, 8.11 and 8.32. Under Hansen, this was not error. That Hansen involved shooting at an inhabited dwelling (which the defendant claimed he did not know was occupied) and this case involves shooting at an occupied motor vehicle, is a distinction "without difference. Both means of violating section 246 involve a high probability that death will result and therefore constitute inherently dangerous felonies; if anything, shooting at an occupied motor vehicle poses a greater risk of death than shooting at an inhabited dwelling which may be unoccupied at the time of the shooting. (See Hansen, supra, 9 Cal.4th at p. 310, 36 Cal.Rptr.2d 609, 885 P.2d 1022 ["The nature of the other acts proscribed by section 246 reinforces the conclusion that the Legislature viewed the offense of discharging a firearm at an inhabited dwelling as posing a risk of death comparable to that involved in shooting at an occupied [ ] motor vehicle."], italics in original.) Moreover, application of the second degree felony-murder rule would not result in the subversion of legislative intent because most homicides do not result from shooting at an occupied motor vehicle and therefore application of the felony-murder rule in this context will not preclude the jury from considering malice in the great majority of all homicides. Finally, application of the felony-murder rule in this context is entirely consistent with the fundamental purpose of the felony-murder rule: deterrence of negligent or accidental killings that occur in the commission of dangerous felonies.
We are not persuaded that a contrary result is compelled by the recently decided People v. Bejarano (2007) 149 Cal.App.4th 975, 57 Cal.Rptr.3d 486 (Bejarano), which defendant discusses in a supplemental letter brief.[3]Bejarano concludes that the Ireland merger doctrine precludes using a conviction for shooting at an occupied motor vehicle in violation of section 246 as the predicate felony for second degree felony murder. Bejarano comes to this result by (1) analogizing shooting at an occupied motor vehicle (§ 246) to discharging a firearm in a grossly negligent manner (§ 246.3) as occurred in Randle, supra, 35 Cal.4th 987, 28 Cal.Rptr.3d 725, 111 P.3d 987, in which our Supreme Court found the Ireland merger doctrine precluded using violation of section 246.3 as a predicate felony for second degree felony murder; and (2) distinguishing the facts of Bejarano from Robertson, supra, 34 Cal.4th 156, 17 Cal. *141 Rptr.3d 604, 95 P.3d 872, in which, prior to Randle, our Supreme Court held that violation of section 246.3 could be used as a predicate felony.
We begin with a discussion of Robertson and Randle. In both cases there was evidence that the respective defendants shot at the victims. The defendant in Robertson maintained he only fired in the air to scare off car thieves; the defendant in Randle admitted shooting at the victim to break up a fight. Reasoning that a principle purpose of the felony-murder rule is deterrence (Robertson, supra, 34 Cal.4th at p. 165, 17 Cal.Rptr.3d 604, 95 P.3d 872), the court in Robertson found the Ireland merger doctrine inapplicable to the predicate offense of a violation of section 246.3 because knowledge that punishment for second degree murder may ensue would deter individuals from intentionally discharging a firearmwhether to celebrate a festive occasion or to frighten away persons who do not present a threat of imminent harm. (Robertson, supra, at p. 171, 17 Cal.Rptr.3d 604, 95 P.3d 872.)
The Randle court, in contrast, held the Ireland merger doctrine applied, reasoning that the fact that the defendant in Randle "admitted shooting at [the victim] distinguishes Robertson and supports application of the merger rule here. Defendant's claim that he shot [the victim] in order to rescue Byron simply provided a motive for the shooting; it was not a purpose independent of the shooting." (Randle, supra, 35 Cal.4th at p. 1005, 28 Cal. Rptr.3d 725, 111 P.3d 987.) Robertson's "collateral purpose" of trying to frighten was absent in Randle as the uncontroverted evidence was that the defendant shot at the victim, thus committing an Ireland merger assault.
In Bejarano, the defendant maintained he did not intend to shoot the victim, an apparent innocent bystander driving a Honda, but admitted shooting at rival gang members driving in an Oldsmobile. (Bejarano, supra, 149 Cal.App.4th at p. 980, 57 Cal.Rptr.3d 486.) Relying on Randle, the court in Bejarano, held that the Ireland merger doctrine precluded using discharging a firearm at an occupied motor vehicle in violation of section 246 as the predicate felony for second degree felony murder in that case because the defendant "admitted he shot at, and intended to shoot, the rival gang members. Appellant had no collateral and independent felonious purpose" other than to commit an assault. (Id. at p. 978, 57 Cal.Rptr.3d 486.) The court in Bejarano concluded: "Thus, Randle controls this case, the predicate felony merged with the homicide, and the trial court erred in instructing the jury on second degree felony murder based on discharging a firearm at an occupied motor vehicle in violation of section 246." (Id. at p. 990, 57 Cal.Rptr.3d 486.)
The Bejarano court carefully analyzed the development of the Ireland merger doctrine, including the Supreme Court's opinions in Hansen, Mattison, Robertson and Randle. (Bejarano, supra, 149 Cal.App.4th at pp. 984-986, 57 Cal. Rptr.3d 486.) However, the Court of Appeal did not expressly explain why Randle, and not Hansen, controlled on the issue of whether shooting at an occupied motor vehicle in violation of section 246 may be used as the predicate felony for a conviction of second degree felony murder. Although we agree the path between Robertson and Randle is precarious, the fact is both cases deal with section 246.3, negligent discharge of a firearm. Hansen, however, considers section 246, shooting at an inhibited dwelling or occupied vehicle, the same crime present here. We must follow Hansen (Auto Equity Sales v. Superior Court (1962) 57 Cal.2d 450, 453, 20 Cal.Rptr. 321, 369 P.2d 937) and see no *142 principle that allows us to ignore Hansen in favor of the closely related but not directly on point Randle.
Ultimately, we need not decide whether Bejarano's analysis of the Ireland merger doctrine in section 246 cases is correct. When one of multiple theories presented to a jury has no application to the facts of the case, the verdict will nevertheless be affirmed "unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory." (People v. Perez (2005) 35 Cal.4th 1219, 1233, 29 Cal. Rptr.3d 423, 113 P.3d 100, citing People v. Guiton (1993) 4 Cal.4th 1116, 1130, 17 Cal.Rptr.2d 365, 847 P.2d 45.) Error in giving an instruction that has no applicability to the facts of the case is subject to review under People v. Watson (1956) 46 Cal.2d 818, 836, 299 P.2d 243. Reversal is required only if it is reasonably probable the result would have been more favorable to the defendant absent the error. (Ibid.) Here, even if it was error to instruct on second degree felony murder because violation of section 246 could not be the predicate felony, the error was harmless. This is because the jury found defendant guilty of the attempted murder of Michael. To do so, it necessarily found an intent to kill. (See CALJIC No. 8.66 [to prove attempted murder, it must be proved that the defendant "harbored express malice aforethought, namely, a specific intent to kill unlawfully another human being."].) Having found defendant guilty of attempting to kill Michael, there is no reasonable probability the jury would have found defendant guilty of Patricia's killing only on the second degree felony-murder theory and not on an express malice intent to kill basis. No reasonable juror could have found defendant had the requisite mental state of malice aforethought vis a vis the attempted murder of Michael, but not as to the murder of Patricia.

B. Alleged Instructional Errors

1. The Trial Court's Fleeting Reference to "Attempted Second Degree Murder" In Some Instructions Was Harmless

Defendant contends the trial court prejudicially erred by referring to `the count charging defendant with the attempted murder of Michael, as "attempted second degree murder." He argues: "By calling the attempted murder offense attempted second-degree murder, the trial court suggested jurors could treat malice the same for both the murder and attempted murder using the felony-murder theory, in effect imputing malice and thereby excusing the necessity for evidence of that mental state." We disagree.
Unlike murder, attempted murder is not divided into degrees. (People v. Billa (2003) 31 Cal.4th 1064, 1071 fn. 4, 6 Cal.Rptr.3d 425, 79 P.3d 542.) In People v. Montes (2003) 31 Cal.4th 350, 2 Cal. Rptr.3d 621, 73 P.3d 489, the court explained that "`an attempt to commit murder that is "willful, deliberate, and premeditated" does not establish a greater degree of attempted murder but, rather, sets forth a penalty provision prescribing an increased sentence (a greater base term) to be imposed upon a defendant's conviction of attempted murder when the additional specified circumstances are found true by the trier of fact.' [Citation.]" (Id. at p. 353, fn. 2, 2 Cal.Rptr.3d 621, 73 P.3d 489.)
California has no crime of attempted felony murder. (People v. Bland (2002) 28 Cal.4th 313, 328, 121 Cal.Rptr.2d 546, 48 P.3d 1107.) This is because, whereas implied malice suffices for murder, it cannot support a conviction for attempted *143 murder. (Id. at pp. 327-328, 121 Cal.Rptr.2d 546, 48 P.3d 1107 ["`"The wrong-doer must specifically contemplate taking life; and though his act is such as, were it successful, would be murder, if in truth he does not mean to kill, he does not become guilty of an attempt to commit murder. [Citation.]" [Citations.]'"].)
In reviewing a claim of error in jury instructions, we do not view individual instructions in artificial isolation, but consider the instructions given as a whole in the context of the entire trial record. A judgment will be set aside on the basis of instructional error only if the error has resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13.) "A miscarriage of justice occurs only when it is reasonably probable that the jury would have reached a result more favorable to the appellant absent the error. [Citations.]" (People v. Moore (1996) 44 Cal.App.4th 1323, 1331, 52 Cal.Rptr.2d 256.)
Here, defendant challenges the following instructions:
 "The crimes of Murder and Attempted Murder as charged in Counts [1] and [2] require specific intent."
 "The specific intent and mental state with which an act is done may be shown by the circumstances surrounding the commission of the act. However, you may not find the defendant guilty of the crime charged in Counts 1, 2, or the crimes of 2[nd] degree murder and attempted 2[nd] degree murder, which are lesser crimes, or find the allegation a felony committed for the benefit of a street gang to be true, unless the proved circumstances are not only (1) consistent with the theory that the defendant had the required specific intent or and mental state but (2) cannot be reconciled with any other rational conclusion...." (CALJIC No. 2.02.)
 "A person who kills another person in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, kills unlawfully but does not harbor malice aforethought and is not guilty of 1st degree murder, attempted 1st degree murder or attempted 2nd degree murder...." (CALJIC No. 5.17.)
Whereas the foregoing instructions incorrectly referred to "attempted second degree murder," the instructions which actually defined the elements of attempted murder, CALJIC Nos. 8.66 (attempted murder) and 8.67 (willful, deliberate and premeditated attempted murder), correctly identified the charged offense as attempted murder.[4] In addition, CALJIC No. 17.19.5, which defined the elements of the personal discharge of a firearm causing great bodily injury enhancement, also correctly referred to "attempted murder" and not "attempted second degree murder." And the single instruction defining felony-murder, CALJIC No. 8.32, referred only to murder and not to attempted murder at all.[5]
*144 Under these circumstances, although the trial court incorrectly referred to attempted murder that was not willful, premeditated and deliberate as "attempted second degree murder," the error was patently harmless. Considering the jury instructions as a whole and in the context of the entire trial record, we conclude that it is not reasonably probable that the jury would have reached a more favorable result had the trial court not made these fleeting references to "attempted second degree murder."

2. It Was Not Error to Give CALJIC No. 8.66.1

Defendant contends the trial court erred in giving CALJIC No. 8.66.1.[6] He argues: (1) the instruction misdirected the jury's focus from his actual intent vis a vis Michael to "whether there was a kill zone" from which intent could be inferred and (2) there was insufficient evidence to support the instruction inasmuch as there was no evidence of any primary victim. We disagree.
In People v. Bland, supra, 28 Cal.4th 313, 121 Cal.Rptr.2d 546, 48 P.3d 1107, the court concluded that the doctrine of transferred intent applies to unintended killings, but not to persons not killed. "To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else. The defendant's mental state must be examined as to each alleged attempted murder victim." (Id. at p. 328, 121 Cal.Rptr.2d 546, 48 P.3d 1107.) However, the court in Bland observed, "The conclusion that transferred intent does not apply to attempted murder still permits a person who shoots at a group of people to be punished for the actions toward everyone in the group even if that person primarily targeted only one of them.... [T]he person might still be guilty of attempted murder of everyone in the group, although not on a transferred intent theory[,]" but on a theory of "concurrent intent," not transferred intent. (Id, at p. 329, 121 Cal.Rptr.2d 546, 48 P.3d 1107.)
Under the concurrent intent doctrine, the requisite mental state for attempted murder can be inferred "when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity." (Bland supra, 28 Cal.4th at p. 329, 121 Cal.Rptr.2d 546, 48 P.3d 1107.) For example, the Bland court explained, when a defendant who intends to kill A drives by a group consisting of A, B, and C and attacks the group with automatic weapon fire in order to ensure killing A, the defendant "`has intentionally created a "kill zone" to ensure the death of his primary victim.... When the defendant escalated his attack from a single bullet aimed at A's head to a hail of bullets ... the factfinder can infer that, whether or not the defendant succeeded in killing A, the defendant concurrently intended to kill everyone in *145 A's immediate vicinity to ensure A's death.... Where the means employed to commit the crime against a primary victim creates a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone." (Id. at p. 330, 121 Cal.Rptr.2d 546, 48 P.3d 1107.)
Here, the trier of fact could reasonably infer that defendant shot at the Millers with the intent to kill rival gang members (the primary target) from the following evidence:
 Defendant was a member of the TRG gang;
 The primary rivals of the TRG are Hispanic gangs;
 A white car occupied by several Hispanics drove past defendant and his companions;
 Shortly thereafter, the Millers drove by in a white car;
 Defendant stood directly in front of the Miller's car, aimed and fired at the Millers;
 When defendant gave a gun to Phuong a few minutes later, he told Phoung that he had shot some "Ese" or a "Longo;"
 Phuong was given two guns at the barbeque but only one recently had been fired and nine bullet casings found at the scene of the shooting were tied to this gun.
From this evidence, the jury could also reasonably infer that defendant intended to kill anyone within the "kill zone" and Michael was in the "kill zone." The fact that defendant had mistakenly identified his victims does not detract from the fact that he intended to kill the very people at whom he shot. The trial court properly instructed the jury with CALJIC No. 8.66.1.

3. No Error in Not Instructing on Voluntary Murder or Attempted, Voluntary Manslaughter as a Lesser Included Offense of Murder or Attempted Murder

Defendant contends the trial court erred in refusing to instruct on voluntary manslaughter and attempted voluntary manslaughter as lesser included offenses of murder and attempted murder. He argues that substantial evidence supported a finding of voluntary manslaughter and attempted voluntary manslaughter under the theory of both heat of passion and imperfect self-defense. We disagree.
Trial courts "must generally instruct the jury on lesser included offenses whenever the evidence warrants the instructions, whether or not the parties want it to do so. [Citation.]" (People v. Horning (2004) 34 Cal.4th 871, 904-905, 22 Cal.Rptr.3d 305, 102 P.3d 228.) Voluntary manslaughter is a lesser included offense of murder and attempted voluntary manslaughter is a lesser included offense of attempted murder. (See People v. Montes (2003) 112 Cal.App.4th 1543, 1545, 5 Cal. Rptr.3d 800.)
"Statutory" voluntary manslaughter and attempted voluntary manslaughter arise "upon a sudden quarrel or heat of passion." (§ 192, subd. (a).) The "nonstatutory" version of the offenses arise where the defendant genuinely but unreasonably believes in the need to defend against imminent peril to life or great bodily injury. (See People v. Saille (1991) 54 Cal.3d 1103, 1107, fn. 1, 2 Cal.Rptr.2d 364, 820 P.2d 588.) In either case, a defendant is deemed to have acted without malice, even if he or she intended to kill. (See People v. Blakeley (2000) 23 Cal.4th 82, 87-88, 96 Cal. Rptr.2d 451, 999 P.2d 675.)
"The heat of passion requirement for [attempted] manslaughter has *146 both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, [attempt to] kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively.... `[T]his heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances,' because `no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.' [Citation.]" (People v. Steele (2002) 27 Cal.4th 1230, 1252-1253, 120 Cal.Rptr.2d 432, 47 P.3d 225.) Although no specific type of provocation is required (People v. Berry (1976) 18 Cal.3d 509, 515, 134 Cal.Rptr. 415, 556 P.2d 777), it must be caused by the victim, or be conduct reasonably believed by the defendant to have been engaged in by the victim (People v. Lee (1999) 20 Cal.4th 47, 59, 82 Cal.Rptr.2d 625, 971 P.2d 1001).
Under the doctrine of "imperfect self-defense," malice can be negated by evidence that the defendant "actually, albeit unreasonably, believed it was necessary to defend himself or herself from imminent peril to life or great bodily injury. [Citation.]" (People v. Mejia-Lenares (2006) 135 Cal.App.4th 1437, 1448, 38 Cal. Rptr.3d 404.)
Here, there was no evidence that the Millers engaged in any provocative conduct, or that defendant believed they had. Even if defendant believed the Millers's white car was occupied by rival gang members driving through TRG territory, this is not sufficient provocation to arouse the passions of the ordinarily reasonable person. Moreover, there was no evidence that defendant actually believed that it was necessary to defend himself from imminent peril to life or great bodily injury from the occupants of the white car even if defendant believed they were rival gang members. Accordingly, insufficient evidence supported instructions on either theory of voluntary or attempted voluntary manslaughter.

C. Evidence of Defendant's Postarrest Conduct

Defendant contends he was denied the constitutional right to a fair trial by the admission of evidence that he was uncooperative when he was being transferred from one police car to another, but precluded from introducing evidence that he became uncooperative only after being held in the back of a patrol car for several hours and told that eyewitnesses had not identified him.
Only relevant evidence is admissible. (Evid.Code, § 350.) Evidence is relevant if it tends to prove or disprove any disputed fact of consequence to the determination of the action. (Evid.Code, § 210.) Whether particular evidence is relevant is to be determined by the trial court, acting within its discretion, and we review a claim of error for abuse of discretion. (People v. Kelly (1992) 1 Cal.4th 495, 523, 3 Cal.Rptr.2d 677, 822 P.2d 385.) We review the correctness of a challenged ruling, not the analysis used to reach it. A trial court's erroneous reasoning is no basis for reversal if the decision is correct. (In re Baraka (1992) 6 Cal.App.4th 1039, 1045, 8 Cal.Rptr.2d 221.)
Resisting a peace officer in the discharge of his duty is a misdemeanor. (§ 148.) Generally, uncharged offenses and evidence that tends only to show a defendant has a propensity to commit crimes are not admissible. (People v. Ortiz (2003) 109 Cal.App.4th 104, 111, 134 *147 Cal.Rptr.2d 467.) However, evidence of a defendant's willful resistance to a police officer may be admitted to show consciousness of guilt. (People v. Anderson (1922) 57 Cal.App. 721, 728, 208 P. 204.) Consciousness of guilt evidence remains relevant even if the conduct can be explained in another way. (People v. Hughes (2002) 27 Cal.4th 287, 335, 116 Cal.Rptr.2d 401, 39 P.3d 432.) However this evidence is subject to the probative/prejudice balancing of Evidence Code, section 352. "Prejudicial" is not synonymous with "damaging." "`The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against [one party] as an individual and which has very little effect on the issues.'" (People v. Branch (2001) 91 Cal.App.4th 274, 286, 109 Cal.Rptr.2d 870.)
Here, at an Evidence Code section 402 hearing, the prosecutor argued that defendant's uncooperativeness when he was being moved from one police car to another was admissible to prove consciousness of guilt and to counter a contrary inference from evidence adduced by defendant that he was cooperative when an oral swab for DNA analysis was taken from him at County Jail. Defense counsel countered that the evidence was just slightly probative of consciousness of guilt because an innocent person might behave the same way and was more prejudicial than probative under Evidence Code section 352 because the jury could use it to find defendant was mean and vicious.
The trial court allowed the evidence, reasoning: "I'm really not approaching it so much from a consciousness of guilty [sic] issue, but whetherbecause, as I said, I was drawing the conclusion, and I'm hearing the evidence the same time the jury does, drawing the conclusion that Mr. Jones was like this quiet, cooperative, meek kind of person, and that is the kind of person who a gang such as TRG might decide to take advantage of by making that person the fall guy. [¶] An angry confrontation with police is significant evidence that he is not the quiet, meek, and cooperative person that is not deliberately being presented so much as impliedly proved being presented to the jury. [¶] So in that regard it has significant probative value. And the prejudicial effect, I mean, he's been identified by witnesses as a person who shot and killed one person, and wounded a child. So compare that to arguing with the police, it's not much of a prejudicial effect."
At trial, Detective Hector Gutierrez testified that he arrived at the apartment on Orange a little after 9:00 p.m. on June 22, 2003. Shortly thereafter, defendant was handcuffed and placed in the back seat of a marked patrol car. During the ensuing investigation, defendant was taken out of the patrol car and put back in several times without incident. At about 1:45 a.m., defendant was transferred into Gutierrez's police vehicle. Some time later, as Gutierrez was going to transfer him to a marked patrol car to be transported to the police station, defendant spat, kicked at the back seat, yelled and tried to bite the back seat. Gutierrez was required to use force and needed the assistance of another officer to get defendant into the patrol car.
Defendant's resistance to Gutierrez's efforts to transfer him from one police car to another was admissible to show consciousness of guilt. It was not more prejudicial than probative because it was not evidence which would uniquely tend to evoke an emotional response against defendant.
Finally, the trial court correctly precluded defendant from eliciting Gutierrez's testimony that defendant acted up only after various witnesses failed to identify him at *148 the scene.[7] Coming from Gutierrez, this would have been inadmissible hearsay. Defendant's alternatives were to present the testimony of the witnesses that failed to identify him or to himself explain his behavior.

D. There Was No Cumulative Error

Defendant contends that, even if individually harmless, the errors were cumulatively prejudicial. In as much as we have found just one errorthe fleeting reference to attempted murder that is riot premeditated as "attempted second degree murder"and that error to be harmless, defendant's cumulative error claim must necessarily fail.

E. Sentencing

1. Imposition of the Upper Term

Defendant contends imposition of the upper term on counts 2, 3, and 4, as well as the section 12022.5 enhancement on count 3, violated Blakely v. Washington (2004) 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403.[8] We disagree.
Recently, in People v. Black (2007) 41 Cal.4th 799, 62 Cal.Rptr.3d 569, 161 P.3d 1130 (Black II), our Supreme Court held that "as long as a single aggravating circumstance that renders a defendant eligible for the upper term sentence has been established in accordance with the requirements of Apprendi [v. New Jersey (2000) 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435] and its progeny, any additional fact finding engaged in by the trial court in selecting the appropriate sentence among the three available options does not violate the defendant's right to a jury trial." (Italics in original.) The court found that imposition of the high term can be based on the aggravating circumstance of the number or increasing seriousness of a defendant's prior convictions (Cal. Rules of Court, rule 4.421(b)(2)) without offending Apprendi.[9] (Id. at pp. 819-820, 62 Cal. Rptr.3d 569, 161 P.3d 1130.) In so doing, it rejected the defendant's contention that, while the fact of a prior conviction could be considered by the trial court, he was entitled to a jury trial on the issue of whether the prior convictions were numerous or of increasing seriousness. (Ibid.) It reasoned that the exception for prior convictions includes "not only the fact that a prior conviction occurred, but also other related issues that may be determined by examining the records of the prior convictions. [Citations.]" (Id. at p. 819, 62 Cal.Rptr.3d 569,161 P.3d 1130.)
Here, the trial court considered the following aggravating factors in selecting the high term on the convictions for attempted second degree murder (9 years), assault *149 with a semiautomatic firearm (9 years), shooting at an occupied motor vehicle (7 years):
 The number and increasing seriousness of defendant's prior convictions. (Rule 4.421(b)(2).)
 Defendant was on probation or parole when he committed the charged offenses. (Rule 4.421(b)(4).)
 Defendant's prior unsatisfactory performance on probation or parole. (Rule 4.421(b)(5).)
Since each factor relied upon by the trial court is related to defendant's recidivism, reliance on these factors to select the high term did not violate the Apprendi line of cases.

2. Restitution and Parole Revocation Fines

Defendant contends the trial court erred in imposing a restitution fine and parole revocation fine (§§ 1202.4, 1202.45) in the amount of $200 "per year." He argues that, inasmuch as his total sentence is 54 years to life, $200 per year could potentially exceed the $10,000 statutory maximum ($200 multiplied by 54 years equals $10,800).[10] We agree.
Except in circumstances not relevant here, section 1202.4, subdivision (b) mandates imposition of a restitution fine. According to that subdivision: "(1) The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense, but shall not be less than two hundred dollars ($200), and not more than ten thousand dollars ($10,000), if the person is convicted of a felony,.... [¶] (2) In setting a felony restitution fine, the court may determine the amount of the fine as the product of two hundred dollars ($200) multiplied by the number of years of imprisonment the defendant is ordered to serve, multiplied by the number of felony counts of which the defendant is convicted."
Section 1202.45 mandates: "In every case where a person is convicted of a crime and whose sentence includes a period of parole, the court shall at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional parole revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4...."
Imposition of a restitution fine in an amount greater than $10,000 is an unlawful sentence. (People v. Blackburn (1999) 72 Cal.App.4th 1520, 1534, 86 Cal. Rptr.2d 134.)
Here, the People essentially agree that the maximum fine that could lawfully be imposed is $10,000 and suggest that, in this case, the fines would simply "max out" when they reached $10,000 in defendant's 50th year of confinement; alternatively the People request that we modify the judgment modified to set the total amount of the fines at $10,000. We shall modify the judgment.

DISPOSITION
The judgment is hereby modified so as to reduce the section 1202.4 and section *150 1202.45 fines to no more than $10,000 each; the judgment is otherwise affirmed. The trial court is directed to amend the abstract of judgment to reflect these modifications and to forward a certified copy of the amended abstract to the Department of Corrections. (§§ 1213,1216.)
WE CONCUR: COOPER, P.J., and FLIER, J.
NOTES
[1] Defendant was charged with murder, attempted murder, assault with a semi-automatic firearm and shooting at an occupied motor vehicle; enhancements for firearm use and acting for the benefit of a criminal street gang were also alleged. A jury found defendant guilty of the substantive charges and found true the gang and personal firearm use enhancements (Pen.Code, § 186.11, subd. (b)(1), § 12022.53, subd. (b), and § 12022.5, subd. (a)(1)), but failed to reach a unanimous verdict on the personal discharge of a firearm enhancements (§ 12022.53, subds.(c) & (d)). He was sentenced to a total of 54 years to life in prison.

All further undesignated section references are to the Penal Code.
[2] For purposes of section 246, "`inhabited' means currently being used for dwelling purposes, whether occupied or not." (§ 246.)
[3] The People did not file a supplemental brief.
[4] In pertinent part, CALJIC No. 8.66 provides: "Every person who attempts to murder another human being is guilty of a violation of Penal Code sections 664 and 187.[¶] Murder is the unlawful killing of a human being with malice aforethought. [¶] In order to prove attempted murder, each of the following elements must be proved; [¶] 1. A direct but ineffectual act was done by one person towards killing another human being; and [¶] 2. The person committing the act harbored express malice aforethought, namely, a specific intent to kill unlawfully another human being."
[5] As given, CALJIC No. 8.32 reads: "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs as the direct causal result of the commission of the crime of shooting at an occupied vehicle is murder of the second degree when the perpetrator had the specific intent to commit that crime. The specific intent to commit shooting at an occupied vehicle and the commission of that crime must be proved beyond a reasonable doubt."
[6] As given, CALJIC No. 8.66.1 reads: "A person who primarily intends to kill one person may also concurrently intend to kill other persons within a particular zone of risk. This zone of risk is termed "the kill zone." [¶] The intent is concurrent when the nature and scope of the attack, while directed at a primary victim, are such that it is reasonable to infer the perpetrator intended to kill the primary victim by killing everyone in the victim's vicinity. [¶] Whether a perpetrator actually intended to kill the victim either as a primary target or as someone within the kill zonekill zone of risk, is an issue to be decided by you."
[7] During Gutierrez's testimony, defense counsel informed the trial court that he intended to adduce evidence that while defendant was being transferred from car to car over a period of four hours, defendant was also being shown to witnesses and was told by the police that the witnesses had not identified him. According to defense counsel, this evidence was relevant to explain why defendant became uncooperative when he was moved for the third time. The prosecutor objected on hearsay grounds. Finding the evidence irrelevant to the probative value articulated by the trial court, the trial court precluded this evidence.
[8] Defendants 54 year to life term was comprised of a determinate term of 29 years (9 years for the attempted murder, plus enhancements of 10 years pursuant to section 12022.53, subdivision (b) and 10 years pursuant to section 186.22, subdivision (b)(1)(A)), plus an indeterminate term of 25 years to life (15 years to life for the murder, plus a consecutive 10 years pursuant to section 12022.53, subdivision (b)); sentence on the remaining counts was stayed pursuant to section 654.
[9] All undesignated rule references are to the California Rules of Court.
[10] The People also argue that defendant waived/forfeited this issue by failing to object to the fines in the trial court. But if defendant is correct that the trial court imposed a restitution fine that could not lawfully be imposed under any circumstances, it was an unlawful sentence to which the general objection and waiver rules do not apply. (People v. Andrade (2002) 100 Cal.App.4th 351, 354-355, 121 Cal.Rptr.2d 923 [distinguishing between application of the waiver doctrine to a failure to object to imposition of a fine and inapplicability of the doctrine to failure to object to imposition of a fine resulting in an unauthorized sentence]; see also People v. Chambers (1998) 65 Cal.App.4th 819, 823, 76 Cal.Rptr.2d 732 [failure to object to imposition of restitution fines is not waiver].)