Opinion
AARON, J.
In 1992, a jury convicted Michael Hansen of one count of second degree murder (Pen. Code, § 187, former subd. (a))[1] and found that Hansen personally used a firearm within the meaning of former section 12022.5, subdivision (a). The jury also convicted Hansen of one count of shooting at an inhabited dwelling. (§ 246.) On appeal, the Supreme Court affirmed Hansen’s conviction. (People v. Hansen (1994) 9 Cal.4th 300, 311 [36 Cal.Rptr.2d 609,885 P.2d 1022] (Hansen).) Rejecting Hansen’s contention to the contrary, the Supreme Court determined that the offense of shooting at an inhabited dwelling did not “merge” with a homicide that results from such a shooting. *911 (Id. at p. 316.) The offense of shooting at an inhabited dwelling could therefore form the basis for a second degree felony-murder conviction. (Ibid.) Fifteen years later, the Supreme Court reconsidered the scope of the second degree felony-murder rule and expressly overruled this holding. (People v. Chun (2009) 45 Cal.4th 1172, 1199 [91 Cal.Rptr.3d 106, 203 P.3d 425] (Chun)) In Chun, the Supreme Court determined that the offense of shooting at an inhabited dwelling was “assaultive” in nature, and thus merged with a resulting homicide, such that the second degree felony-murder rule could not apply. (Id. at p. 1200.)
Relying on Chun, Hansen filed a petition for writ of habeas corpus in the San Diego County Superior Court. Hansen argued that the Supreme Court’s holding in Chun applied to the theory of second degree felony murder presented at his trial, that it was therefore error for his jury to have been instructed that second degree felony murder was a valid theory for a conviction, and that error required reversal of his conviction for second degree murder. The trial court agreed and granted Hansen’s petition.
The People of the State of California, represented by the San Diego County District Attorney (District Attorney), appeal. The District Attorney contends that the trial court erred in applying Chun retroactively to Hansen’s conviction and in finding reversible error. The District Attorney further contends that the trial court erred in considering certain statements and declarations from jurors in Hansen’s underlying trial in assessing the prejudicial impact of the error. We conclude that the court properly gave retroactive effect to Chun and, even setting aside the juror statements and declarations, that the error under Chun was prejudicial. We therefore affirm the trial court’s order.
FACTS
We adopt the statement of facts that the Supreme Court articulated in Hansen-.
“On September 19, 1991, defendant Michael Hansen, together with Rudolfo Andrade and Alexander Maycott, planned to purchase $40 worth of methamphetamine. With that purpose, defendant, accompanied by his girlfriend Kimberly Geldon and Maycott, drove in defendant’s Camaro to an apartment duplex located in the City of San Diego. Upon arriving at the duplex, defendant pounded on the door of the upstairs apartment where Christina Almenar resided with her two children. When he received no response, defendant proceeded to return to his automobile and was approached by Michael Behaves.
“Behaves resided in the downstairs apartment with Martha Almenar (Christina’s sister) and Martha’s two children, Diane Rosalez, thirteen years *912 of age, and Louie Miranda, five years of age. At the time, Diane and Louie were outside with Behaves helping him with yard work. In response to a question from Behaves, defendant said he was looking for Christina. When Behaves stated he had not seen her, defendant asked whether Behaves would be able to obtain some crystal methamphetamine (speed). After making a telephone call, Behaves informed defendant that he would be able to do so. Defendant said he would attempt to purchase the drug elsewhere but, if unsuccessful, would return.
“Defendant and his companions departed but returned approximately 20 minutes later. Defendant, accompanied by Behaves, Maycott, and Geldon, then drove a short distance to another apartment complex. Defendant parked his vehicle, gave Behaves two $20 bills, and told Behaves he would wait while Behaves obtained the methamphetamine. Behaves said he would be back shortly.
“When Behaves failed to return, defendant and his companions proceeded to Behaves’s apartment. Defendant knocked on the door and the windows. Diane and Louie were inside the apartment alone but did not respond. Their mother, Martha, had left the apartment to meet Behaves, who had telephoned her after eluding defendant. After meeting Behaves at a hardware store, Martha telephoned her children from a public telephone booth. Diane answered and told her mother that the ‘guys in the Camaro’ had returned, pounded on the door, and then had left.
“Meanwhile, defendant, Maycott, and Geldon returned to the location where Andrade was waiting for them, acquiring en route a handgun from an acquaintance. The three men then decided to return to Behaves’s apartment with the objective either of recovering their money or physically assaulting Behaves. At approximately 7:30 p.m., defendant approached the apartment building in his automobile with the lights turned off, and then from the vehicle fired the handgun repeatedly at the dwelling. At the time, Diane was inside the apartment, in the living room with her brother. The kitchen and living room lights were on. Diane ,was struck fatally in the head by one of the bullets fired by defendant.
“On the basis of information furnished by witnesses to the shooting, the police were able to trace to defendant the vehicle from which the shots had been fired. On September 20, at approximately 3 a.m., police officers arrested defendant at the room of a motel where he was staying. Searching the trunk of his Camaro, the police discovered a nine-millimeter semi-automatic handgun and an empty ammunition clip for the weapon.
“Five bullet holes were found at the scene of the homicide inside the apartment. It later was determined that shell casings and three bullets *913 recovered at that location had been fired from the handgun found inside the trunk of defendant’s vehicle.
“That same morning, at 7 a.m., defendant was advised of his Miranda rights (Miranda v. Arizona (196[6]) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]) and waived them. He then confessed to having fired several shots from a handgun aimed at the apartment building. He stated that he had been waiting for someone whom he believed ‘took off with forty bucks’ belonging to him, that he was shooting at ‘[j]ust the house,’ and that he would not have engaged in this conduct had he known ‘those kids were in there.’
“At trial, as part of the defense case, defendant testified that on the day of the shooting he had consumed a substantial quantity of alcohol and some crystal methamphetamine. He further testified that, when he initially returned to Behaves’s apartment, he had observed the lights were on, but after knocking on the door and receiving no response, he believed no one was inside. He denied any recollection of actually having fired the shots at the apartment, although he remembered hearing ‘four or five loud noises,’ and denied having intended to harm anyone.
“A neurologist and a neuropsychologist testified that defendant suffered from a mild prefrontal lobe injury that, in conjunction with the use of alcohol and drugs, could result in sudden, unplanned, and impulsive actions. A toxicologist testified regarding defendant’s blood-alcohol level and its possible effects, based upon defendant’s report as to the amount of alcohol he had consumed prior to the shooting. (His testimony did not refer to the possible effect of defendant’s use of crystal methamphetamine, as testified to by defendant.)
“The trial court instructed the jury on several theories of murder, including second degree felony murder as an unlawful killing that occurs during the commission or attempted commission of a felony inherently dangerous to human life, and further instructing that the felony of shooting at an inhabited dwelling is inherently dangerous to human life. The jury returned a verdict finding defendant guilty of second degree murder (without specifying the theory upon which the conviction was based), and found true the allegation that he personally used a firearm during the commission of that offense (§ 12022.5, subd. (a)). The jury also found defendant guilty of discharging a firearm at an inhabited dwelling. At sentencing, the trial court imposed a term of imprisonment of 15 years to life for the second degree murder conviction, plus a consecutive term of 4 years for the personal-use-of-a-firearm enhancement. The court also imposed a term of five years for the offense of shooting at an inhabited dwelling, but stayed the sentence for that offense pursuant to section 654.” (Hansen, supra, 9 Cal.4th at pp. 305-307.)
*914 DISCUSSION
I
In this habeas corpus appeal, “[o]ur standard of review is de novo with respect to questions of law and the application of the law to the facts. We accept as final the superior court’s resolution of pure questions of fact if they are supported by substantial evidence.” (In re Richards (2012) 55 Cal.4th 948, 960 [150 Cal.Rptr.3d 84, 289 P.3d 860].) Where, as here, the trial court did not hear evidence or make findings of fact, our review of the trial court’s order is de novo. (Ibid.)
“[B]ecause petitioner seeks to overturn a final judgment in a collateral attack, he bears the burden of proof. [Citation.] ‘ “For purposes of collateral attack, all presumptions favor the truth, accuracy, and fairness of the conviction and sentence; defendant thus must undertake the burden of overturning them. Society’s interest in the finality of criminal proceedings so demands, and due process is not thereby offended.” ’ [Citation.]” (In re Avena (1996) 12 Cal.4th 694, 710 [49 Cal.Rptr.2d 413, 909 P.2d 1017].)
II
A
The District Attorney first contends that the trial court erred in finding that Chun could apply to Hansen’s habeas corpus petition because Hansen’s conviction was final on appeal 15 years prior to the decision in Chun. The District Attorney urges that we reject the holding of In re Lucero (2011) 200 Cal.App.4th 38 [132 Cal.Rptr.3d 499] (Lucero), in which the Court of Appeal for the Third Appellate District found that Chun could be applied retroactively to a conviction that was already final on appeal when Chun was decided. (Lucero, supra, at p. 46.) The District Attorney argues that due process, under either the federal or the California Constitution, does not require that judicial changes to California criminal law be applied retroactively to convictions that are final on appeal. Instead, she contends, well-settled principles of finality counsel against retroactivity in this case.
Hansen counters that Lucero was correctly decided and that Chun should be applied to convictions that were already final on appeal. Hansen argues that California has adopted the rule applicable to federal criminal law, which requires that judicial decisions that narrow the scope of criminal liability be applied retroactively to convictions that are final on appeal. (See Schriro v. Summerlin (2004) 542 U.S. 348, 351-352 [159 L.Ed.2d 442, 124 S.Ct. 2519] (Schriro).) Hansen further argues that failure to find retroactivity here would *915 be unjust and would constitute a miscarriage of justice because the Supreme Court in Chun adopted the very arguments that Hansen advanced in his direct appeal.
B
We begin with a brief summary of the Supreme Court’s decision in Chun. The defendant in Chun was accused of taking part in a fatal car-to-car shooting. The victim was shot while the car in which he was riding was stopped at a traffic light. (Chun, supra, 45 Cal.4th at pp. 1178-1179.) The defendant was a passenger in another car that stopped near the car in which the victim was riding, from which the shots were fired. (Id. at p. 1179.) The defendant was prosecuted as the direct shooter and also, in the alternative, as an aider and abettor. (Ibid,.) After receiving instruction on several theories of murder, including second degree felony murder, the jury convicted the defendant of second degree murder without specifying its theory. (Ibid.) On appeal, the defendant contended that the second degree felony-murder rule had no statutory basis and was therefore unconstitutional. (Id. at p. 1180.) The defendant further contended that the second degree felony-murder rule, even if valid, could not apply to him because the underlying felony at issue, shooting at an occupied motor vehicle (§ 246), merged with the resulting homicide. (45 Cal.4th at p. 1189.)
Because “ ‘[t]here are ... no nonstatutory crimes in this state . . .’ [citation],” the Supreme Court first examined the statutory basis for the second degree felony-murder rule. (Chun, supra, 45 Cal.4th at p. 1183.) By statute, murder in California requires “malice aforethought.” (§ 187, subd. (a).) Malice may be express or implied. (§ 188.) Implied malice may be shown “when the circumstances attending the killing show an abandoned and malignant heart.” (Ibid.) In Chun, the Supreme Court determined the second degree felony-murder rule is simply another interpretation of the “abandoned and malignant heart” requirement. “The willingness to commit a felony inherently dangerous to life is a circumstance showing an abandoned and malignant heart.” (Chun, supra, 45 Cal.4th at pp. 1187-1188.) Thus, the second degree felony-murder rule has a statutory basis. (Ibid.)
The Chun court noted that although the second degree felony-murder rule originally applied to all felonies, the court “has subsequently restricted its scope in at least two respects to ameliorate its perceived harshness.” (Chun, supra, 45 Cal.4th at p. 1188.) One restriction is the “merger doctrine,” which “developed due to the understanding that the underlying felony must be an independent crime and not merely the killing itself. Thus, certain underlying felonies ‘merge’ with the homicide and cannot be used for the purposes of felony murder.” (Id. at p. 1189.)
*916 Various interpretations of the merger doctrine have developed over the years, among them, the decision in Hansen. The Supreme Court in Chun swept away much of the prior case law in this area and announced a definitive test for merger: “When the underlying felony is assaultive in nature, such as a violation of section 246 or 246.3, we now conclude that the felony merges with the homicide and cannot be the basis of a felony-murder instruction. An ‘assaultive’ felony is one that involves a threat of immediate violent injury.” (Chun, supra, 45 Cal.4th at p. 1200.) In formulating the new test for merger, the Supreme Court expressly overruled Hansen, which had held that the offense of shooting at an inhabited dwelling (§ 246) did not merge with a resulting homicide. (Chun, supra, 45 Cal.4th at p. 1199.) The ultimate effect of Chun, as relevant to Hansen, is to further reduce the scope of the second degree felony-murder rule by expanding the judicial merger doctrine to include all assaultive felonies.
C
The Chun opinion does not state whether it applies retroactively to convictions, like Hansen’s, that were final on appeal when Chun was decided. It is well-settled that a habeas corpus petitioner may obtain relief where “there has been a change in the law affecting the petitioner.” (In re Harris (1993) 5 Cal.4th 813, 841 [21 Cal.Rptr.2d 373, 855 P.2d 391] (Harris).) The threshold question presented here, however, is whether Chun effected a change in the law that has retroactive effect, i.e., whether the law affecting Hansen, himself, has changed.
Our Supreme Court has not articulated a single test to determine when and under what circumstances a decision should be given retroactive effect to convictions that are final on appeal. In certain cases, the Supreme Court has embraced an expansive theory of retroactivity. For example, in People v. Mutch (1971) 4 Cal.3d 389 [93 Cal.Rptr. 721, 482 P.2d 633] (Mutch), the Supreme Court considered the retroactive effect of its decision overruling established precedent regarding the scope of the offense of aggravated kidnapping. (Id. at p. 392.) The court determined that its decision should be given full retroactive effect to convictions that were final on appeal. (Id. at p. 396.) The court reasoned that because all crimes in California are statutory, the Supreme Court’s new interpretation of the aggravated kidnapping statute was not a change in the law at all. (Id. at p. 394.) Instead, the Supreme Court viewed its decision as a confirmation of the correct interpretation of the statute that should have been applied since its enactment. (Ibid. [“[W]e did not overturn a judge-made rule of common law; rather, we recognized a statutory rule which the Legislature adopted in 1951 but to which courts had not previously given appropriate effect.”].) Given this interpretation, the Supreme Court explained that it need not “undertake the often perilous task *917 of applying to the facts of this case the test of ‘retroactivity’ developed in a well-known series of decisions of the United States Supreme Court.” (Ibid.)
In other cases, largely involving questions of procedure, the Supreme Court has applied a tripartite test derived from the more established criteria for determining the retroactivity of judicial opinions to convictions not yet final on appeal.[2] The tripartite test consists of three elements: “ ‘(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards.’ ” (In re Dabney (1969) 71 Cal.2d 1, 9 [76 Cal.Rptr. 636, 452 P.2d 924]; see In re Johnson (1970) 3 Cal.3d 404, 410 [90 Cal.Rptr. 569, 475 P.2d 841] (Johnson).)
In Lucero, the parties agreed that this tripartite test governed the retroactive application of Chun to convictions that were final on appeal when Chun was decided. (Lucero, supra, 200 Cal.App.4th at p. 45.) Quoting Johnson, supra, 3 Cal.3d at page 413, the court distilled the tripartite test down to one primary issue: “ ‘the more directly the new rule in question serves to preclude the conviction of innocent persons, the more likely it is that the rule will be afforded retrospective application.’ ” (Lucero, supra, 200 Cal.App.4th at p. 45.) The court determined that Chun should apply retroactively to convictions that were final on appeal because the effect of Chun was to narrow a defendant’s potential liability for second degree murder. “Because application of the new rule announced in Chun directly affects inmates such as Lucero, who might have been acquitted of murder but for application of the felony-murder rule, it impacts the reliability of his murder conviction.” (Id. at p. 46.) Although couched in terms specific to the defendant in that case, Lucero would apply with equal force to any defendant whose conviction potentially rests on a theory of second degree felony murder that was rejected in Chun, including Hansen.
*918 D
The question presented is whether this court should follow Lucero and apply Chun retroactively to Hansen’s conviction. “We, of course, are not bound by the decision of a sister Court of Appeal. [Citation.] But ‘[w]e respect stare decisis . . . which serves the important goals of stability in the law and predictability of decision. Thus, we ordinarily follow the decisions of other districts without good reason to disagree.’ [Citation.]” (The MEGA Life & Health Ins. Co. v. Superior Court (2009) 172 Cal.App.4th 1522, 1529 [92 Cal.Rptr.3d 399] (MEGA Life).)
The District Attorney argues that Lucero was wrongly decided and should not be followed. The District Attorney correctly points out that Johnson, on which Lucero heavily relies, involved an allegedly unconstitutional “prior,” i.e., a prior offense that was introduced to enhance punishment, rather than a straightforward habeas corpus challenge. (Johnson, supra, 3 Cal.3d at p. 410.) The discussion of retroactivity in Johnson was not so limited, however, since the Supreme Court sought to answer the same question that is presented here: whether a subsequent judicial decision operated retroactively to invalidate a conviction that was final on appeal. (Id. at pp. 410-413.) The District Attorney is also correct that Guerra, on which Lucero also relies, discussed retroactive application only to convictions that were still pending on appeal, not convictions that were final on appeal. (See Guerra, supra, 37 Cal.3d at p. 413, fn. 24 [“[W]e do not reach the question whether the . . . rule applies on collateral attack to cases now final.”].) These distinguishing aspects do not, however, undermine Lucero's holding or reasoning.
The District Attorney also addresses the tripartite test as applied in Lucero. Regarding “ ‘the purpose to be served by the new standards’ ” (Guerra, supra, 37 Cal.3d at p. 401), the District Attorney maintains that Chun was intended not to rectify a great injustice, but rather, to create a uniform standard for the application of the second degree felony-murder rule. The District Attorney points to the opinion of the New York Court of Appeals in Policano v. Herbert (2006) 7 N.Y.3d 588 [859 N.E.2d 484, 825 N.Y.S.2d 678] (Policano), in which, she claims, the court considered an analogous situation. In Policano, the court applied an identical tripartite test to the question of whether a change in the law of “depraved indifference” murder in New York should be applied retroactively. The court determined that the purpose of the change in the law was to “dispel the confusion between intentional and depraved indifference murder” (id. at p. 603) and that “nonretroactivity poses no danger of a miscarriage of justice” (id. at p. 604). The court stated, “ ‘[defendants who commit[] vicious crimes but who may have been charged and convicted under the wrong section of the statute are not attractive candidates for collateral relief . . . .’ [Citation].” (Ibid.) The District Attorney *919 also argues that the Lucero court gave inadequate weight to the second and third prongs of the tripartite test, which focus on finality and the orderly administration of justice.
We conclude that Lucero properly applied the tripartite test. The purpose of Chun was to separate those actions that are punishable as second degree murder from those that are not. The holding in Chun, at least as applicable here, reflects a narrowing of the class of conduct that may constitute second degree murder. The expanded merger doctrine announced in Chun could render some defendants who were previously convicted under the second degree felony-murder rule entirely innocent of murder. Here, unlike Policano, the change in scope of the second degree felony-murder rule may mean that certain accidental—rather than “vicious”—killers may have been convicted of murder under the rule announced in Hansen but would not have been convicted under the new rule announced in Chun. The Chun decision therefore goes directly to the question of guilt or innocence of a defendant and the validity of his conviction. (See Pryor v. Municipal Court (1979) 25 Cal.3d 238, 258 [158 Cal.Rptr. 330, 599 P.2d 636] [“That purpose implicates questions of guilt and innocence, for conduct which a trier of fact might have found criminal under the older vague definition may clearly fall beyond the scope of the statute as construed in the present case.”].) The second and third prongs, “ ‘ “the extent of the reliance by law enforcement authorities on the old standards, and ... the effect on the administration of justice of a retroactive application of the new standards . . .” ’ [citation],” are much less significant than the first. (Johnson, supra, 3 Cal.3d at p. 410.) Although applying Chun retroactively in this case will result in the additional use of scarce judicial resources, the purpose of the Chun rule clearly outweighs such considerations.[3]
More broadly, the District Attorney contends that habeas corpus relief is available “to correct errors of a fundamental jurisdictional or constitutional type only.” (Harris, supra, 5 Cal.4th at p. 828.) The District Attorney argues that this language reflects a limitation on the scope of habeas corpus relief since Johnson—on which Lucero relies—was decided. But the supporting *920 citation for this language is In re Winchester (1960) 53 Cal.2d 528 [2 Cal.Rptr. 296, 348 R2d 904], which was decided well before Johnson. We are not persuaded that this general language precludes consideration of Hansen’s petition. (See Harris, supra, 5 Cal.4th at p. 841.)
The District Attorney further argues that principles of finality and law of the case generally preclude habeas corpus relief. Such general principles are unpersuasive where, as here, habeas corpus relief is in fact available based on changed law, at least in some circumstances. (See Harris, supra, 5 Cal.4th at p. 843 [“The rule discussed above that one may renew on habeas corpus certain challenges to a final judgment even after unsuccessfully raising the issue on direct appeal, however, presupposes that no law of the case barrier exists.”]; see also Mutch, supra, 4 Cal.3d at p. 396.) Moreover, it is well-settled that the doctrine of law of the case will not be applied “when an intervening decision has altered or clarified the controlling rules of law . . . .” (People v. Jurado (2006) 38 Cal.4th 72, 94 [41 Cal.Rptr.3d 319, 131 P.3d 400].) We do not find the District Attorney’s analogy to the rule in In re Estrada (1965) 63 Cal.2d 740 [48 Cal.Rptr. 172, 408 P.2d 948] enlightening, since it does not assist us in determining when judicial changes in the law must be applied retroactively to convictions that are final on appeal.
Because the District Attorney has not established “good reason to disagree” with the holding in Lucero, and we find its application of the tripartite test persuasive, we follow it here. (See MEGA Life, supra, 172 Cal.App.4th at p. 1529.)
E
The parties dispute an additional issue: whether the federal Constitution’s guarantee of due process requires California to apply Chun retroactively to convictions that are final on appeal. (See Fiore v. White (2001) 531 U.S. 225, 228 [148 L.Ed.2d 629, 121 S.Ct. 712].) Because we conclude that Chun should be applied retroactively to convictions that are final on appeal based on California law, we need not address whether the federal Constitution’s guarantee of due process would mandate such a result, as well.
III
A
In view of our conclusion that Chun should be applied retroactively to Hansen’s conviction, it was error for Hansen’s jury to be presented with a theory of second degree felony murder based on the underlying offense of *921 shooting at an inhabited dwelling. (See Chun, supra, 45 Cal.4th at p. 1201.) We must next determine whether this error was prejudicial.
The parties dispute the applicable standard of review. The District Attorney argues that California’s harmless error standard under People v. Watson (1956) 46 Cal.2d 818 [299 P.2d 243] should apply because the decision to apply Chun retroactively is a matter of state law. Under the Watson standard, a court must determine whether or not it is “reasonably probable that a result more favorable to [the] defendant would have been reached in the absence of the alleged error.” (People v. Thomas (2011) 52 Cal.4th 336, 356 [128 Cal.Rptr.3d 489, 256 P.3d 603].) Hansen argues that the federal “beyond a reasonable doubt” standard under Chapman v. California (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824] should apply because the error goes to an element of second degree murder. “Instructional error regarding the elements of the offense requires reversal of the judgment unless the reviewing court concludes beyond a reasonable doubt that the error did not contribute to the verdict.” (Chun, supra, 45 Cal.4th at p. 1201.)
The District Attorney acknowledges that Chun would require application of the Chapman standard on direct appeal, but argues that our habeas corpus review should be more deferential. For that proposition, the District Attorney cites only Chun, in which the court found a statement of the ostensibly more deferential federal habeas corpus standard to be consistent with the Chapman standard. (Chun, supra, 45 Cal.4th at p. 1204 [discussing California v. Roy (1996) 519 U.S. 2 [136 L.Ed.2d 266, 117 S.Ct. 337]].) Chun therefore provides no support for the District Attorney’s contention that we should depart from the Chapman standard here, and we decline to do so. (See Lucero, supra, 200 Cal.App.4th at pp. 48, 50 [applying two variations of the Chapman standard].)
B
“When the prosecution presents its case to the jury on alternate theories, one of which is legally correct and the other legally incorrect, ‘we must reverse the conviction unless it is beyond a reasonable doubt that the error did not contribute to the jury’s verdict. [Citation.] Such a reasonable doubt arises where, although the jury was instructed on alternate theories, there is no basis in the record for concluding that the verdict was based on a valid ground. [Citation.]’ [Citation.]” (People v. Calderon (2005) 129 Cal.App.4th 1301, 1306-1307 [29 Cal.Rptr.3d 277].)
Where, as here, the jury was instructed on a legally correct theory of implied malice second degree murder and a legally incorrect theory of second degree felony murder, the error is harmless only “[i]f other aspects of the *922 verdict or the evidence leave no reasonable doubt that the jury made the findings necessary for conscious-disregard-for-life malice . . . .” (Chun, supra, 45 Cal.4th at p. 1205.) However, “if the jury reasonably could have convicted [Hansen] of second degree murder based on felony murder and not express or implied malice, we reverse.” (People v. Bejarano (2007) 149 Cal.App.4th 975, 990 [57 Cal.Rptr.3d 486], italics added (Bejarano).)
Hansen’s jury found him guilty of second degree murder, without specifying its theory, and additionally found that he personally used a firearm in committing the murder. The jury also found Hansen guilty of shooting at an inhabited dwelling. (§ 246.) By itself, the jury’s verdict provides no indication that the jury rested its second degree murder verdict on the legally valid theory of implied malice murder.
1
The District Attorney points out that both the prosecution and Hansen’s counsel told the jury during closing arguments that it could not find the personal firearm use enhancement true if it relied on a felony-murder theory. Although the court also believed this principle of law to be correct, it was not included in the court’s instructions to the jury.[4]
If the court’s jury instructions had included the admonition that the jury could find true the personal firearm use enhancement only if it did not rely on a felony-murder theory, such an instruction would properly inform our interpretation of the jury’s verdict. “Absent some contrary indication in the record, we presume the jury follows its instructions [citations] ‘and that its verdict reflects the legal limitations those instructions imposed.’ [Citation.]” (Cassim v. Allstate Ins. Co. (2004) 33 Cal.4th 780, 803-804 [16 Cal.Rptr.3d 374, 94 P.3d 513]; see People v. Avila (2006) 38 Cal.4th 491, 574 [43 Cal.Rptr.3d 1, 133 P.3d 1076].) The jury’s finding on the personal firearm use enhancement would provide an indication that the erroneous felony-murder theory was not the basis of the jury’s verdict. (See Chun, supra, 45 Cal.4th at p. 1205 [jury verdict implied all findings required under the court’s instructions]; see also People v. Ireland (2010) 188 Cal.App.4th 328, 340 [114 Cal.Rptr.3d 915].)
Here, however, the court’s jury instructions did not include any such admonition. Instead, this principle was stated only by counsel. Unlike jury instructions, principles of law that are expressed only by counsel are not *923 binding on the jury. The court instructed Hansen’s jury on this point: “You must accept and follow the law as I state it to you, whether or not you agree with the law. If anything concerning the law said by the attorneys in their arguments or at any other time during trial conflicts with my instmctions on the law, you must follow my instructions.” We cannot presume that the jury followed legal principles that were articulated only by counsel, and not by the court. This is particularly true in this case since, absent counsel’s comments, there is no reason why a lay jury would think that rendering a true finding on the personal firearm allegation would conflict with finding Hansen guilty of murder based on a felony-murder theory.[5] Under the court’s instructions, the jury was free to find the personal firearm use enhancement true and, at the same time, rely on the legally erroneous felony-murder theory for its second degree murder verdict. The true finding on the personal firearm use enhancement thus provides no basis for us to conclude that the Chun error here was harmless.
2
The District Attorney further contends that any rational jury would have had to convict Hansen of second degree murder, on an implied malice theory, given the evidence presented at trial. “[A] demonstration of harmless error does not require proof that a particular jury ‘actually rested its verdict on the proper ground [citation], but rather on proof beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error [citation]. . . .’ [Citation.]” (People v. Gonzalez (2012) 54 Cal.4th 643, 666 [142 Cal.Rptr.3d 893, 278 R3d 1242]; see Chun, supra, 45 Cal.4th at p. 1205.) In this context, we must “exhaustively review[] the trial evidence to determine ‘whether the record contains evidence that could rationally lead to a contrary finding . . .’ [Citations.],” i.e., a jury finding that Hansen did not harbor implied malice. (People v. Gonzalez, supra, at p. 666.)
Implied malice has “ ‘both a physical and a mental component. The physical component is satisfied by the performance of “an act, the natural consequences of which are dangerous to life.” [Citation.] The mental component is the requirement that the defendant “knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life.” [Citation.]’ [Citation.]” (Chun, supra, 45 Cal.4th at p. 1181.) “Implied malice requires that the defendant act with a wanton disregard for the high probability of death [citation], thereby requiring a subjective awareness of a high degree of risk [citation]. It is not enough that a reasonable person would have been aware of the risk. [Citation.]” (People v. Canizalez (2011) 197 *924 Cal.App.4th 832, 842 [128 Cal.Rptr.3d 565]; see People v. Watson (1981) 30 Cal.3d 290, 296-297 [179 Cal.Rptr. 43, 637 P.2d 279] [“[A] finding of implied malice depends upon a determination that the defendant actually appreciated the risk involved, i.e., a subjective standard.”].)[6]
The record contains evidence that would support a finding that Hansen did not harbor implied malice because he did not subjectively appreciate that his actions carried a high probability of death. Hansen testified that, at the time of the shooting, he did not believe there was any chance anyone was inside the apartment at the time he shot at it. Before shooting at the apartment, Hansen went to the apartment twice, knocked on doors and windows, and did not get any response. His testimony was corroborated by the surviving child, Louie, who testified that people pounded on the windows and doors of the apartment twice prior to the shooting. Louie and his sister stayed quiet because their mother had told them not to answer the door. Given this evidence, a rational juror could find that Hansen lacked a subjective awareness that his actions carried a high probability of death because he did not think that anyone was in the apartment at the time he shot at it. Because a rational juror could disbelieve the prosecution’s theory of implied malice murder, we cannot say beyond a reasonable doubt that the jury’s second degree murder verdict necessarily rests on a theory of implied malice. The error here was therefore prejudicial. (See People v. Gonzalez, supra, 54 Cal.4th at p. 666.)
The District Attorney argues that the circumstances of the shooting and Hansen’s pretrial statements to police would compel any rational juror to find that Hansen harbored implied malice. The District Attorney points out that Hansen knew that people lived in the apartment. In addition, Hansen also chose to fire multiple times across the length of the apartment, and it was undisputed that at least one light was on in the apartment at the time of the shooting. While “[mjalice may be inferred from the circumstances of the murder” (People v. Canizalez, supra, 197 Cal.App.4th at p. 842), and the evidence cited by the District Attorney would support a verdict based on *925 implied malice, that does not mean that a contrary finding would be irrational, given Hansen’s testimony about his subjective state of mind.[7]
The disputed evidence regarding the mental component of implied malice distinguishes this case from Chun, where the Supreme Court found a similar error harmless. In Chun, the victim was a passenger in a friend’s car. (Chun, supra, 45 Cal.4th at p. 1179.) “While they were stopped in the left turn lane at a traffic light, a blue Honda with tinted windows pulled up beside them. When the light changed, gunfire empted from the Honda, hitting all three occupants of the [other car].” (Ibid.) The defendant was a passenger in the Honda. (Ibid.) He was tried for the victim’s murder on alternate theories as the direct perpetrator and as an aider and abettor. (Ibid.) The jury returned a general second degree murder verdict that, on its face, did not shed light on the theory of second degree murder relied upon by the jury. (Id. at p. 1204.)
The Supreme Court examined the jury instructions, which included a second degree felony-murder theory based on the predicate offense of shooting at an occupied motor vehicle. (Chun, supra, 45 Cal.4th at p. 1202.) *926 In order to convict the defendant of second degree murder on that theory, the instructions required the jury to find that “[the] defendant had the specific intent to commit the underlying felony of shooting at an occupied vehicle.” (Id. at p. 1205.) Given these instructions, the court held that “any juror who relied on the felony-murder rule necessarily found that defendant willfully shot at an occupied vehicle.” (Ibid.)
Turning to the evidence, the Supreme Court stated, “The undisputed evidence showed that the vehicle shot at was occupied by not one but three persons. The three were hit by multiple gunshots fired at close range from three different firearms. No juror could have found that defendant participated in [the] shooting, either as a shooter or as an aider and abettor, without also finding that defendant committed an act that is dangerous to life and did so knowing of the danger and with conscious disregard for life—which is a valid theory of malice.” (Chun, supra, 45 Cal.4th at p. 1205.) Because “no jur[y] could find felony murder without also finding conscious-disregard-for-life malice,” any error in the second degree felony murder jury instructions was therefore harmless beyond a reasonable doubt. (Ibid.; see People v. Hach (2009) 176 Cal.App.4th 1450, 1457 [98 Cal.Rptr.3d 508] [error under Chun harmless where defendant shot victim from 10 feet away knowing car was occupied].)
As in Chun, the jury here was instructed that it must find that Hansen possessed specific intent to shoot at an inhabited dwelling in order to find second degree felony murder. The jury’s general second degree murder verdict demonstrates that the jury found that Hansen possessed such specific intent, i.e., that Hansen willfully shot at an inhabited dwelling. However, unlike shooting at an occupied vehicle (the offense at issue in Chun), shooting at an inhabited dwelling does not require that individuals be present in the dwelling at the time of the shooting. (§ 246 [“As used in this section, ‘inhabited’ means currently being used for dwelling purposes, whether occupied or not.”]; see Hansen, supra, 9 Cal.4th at p. 310.) “A defendant may violate section 246 by discharging a firearm into an inhabited, but temporarily unoccupied dwelling. In that circumstance, there is no person present to be the target of the unlawful attack and the threat of injury or risk to human health and safety is lacking.” (In re Daniel R. (1993) 20 Cal.App.4th 239, 244 [24 Cal.Rptr.2d 414].) By contrast, the act of shooting at an occupied vehicle is more likely to carry some risk of injury because at least one person must be present in an occupied vehicle. (See People v. Ochoa (2001) 26 Cal.4th 398, 461-462 [110 Cal.Rptr.2d 324, 28 P.3d 78].)
The specific circumstances of the shooting here are, moreover, quite different from the facts of Chun. The victim in Chun was shot from a neighboring car, several feet away, while both cars were stopped on a public *927 street. The victim’s car was indisputably occupied. It appears that no reasonable argument could be made that the defendant in Chun was unaware of that fact. Here, by contrast, Hansen fired at the apartment from many feet away after knocking twice on the doors and windows and receiving no response. Unlike in Chun, in which there was no evidence from which a rational juror could find that the defendant did not know of the danger and did not harbor conscious disregard for life, a rational juror could have believed Hansen’s testimony that he was not aware that the apartment was occupied at the time he shot into the apartment, and still convicted Hansen of second degree murder based on a legally erroneous felony-murder theory.
The decision in Bejarano, supra, 149 Cal.App.4th at page 979, is instructive in this context. In that case, the jury convicted the defendant of second degree murder, again without specifying its theory. The jury was presented with alternate theories of second degree murder, including implied malice and felony murder. (Id. at pp. 990-991.) As in Chun, the predicate offense was shooting at an occupied motor vehicle. (Id. at p. 990.) Predicting the result in Chun, the Bejarano court decided that this offense merged with any resulting homicide and thus could not form the basis of a second degree felony murder conviction. (Ibid) In assessing the question of prejudice, the court examined the evidence presented at trial. The victim was shot once while driving in the vicinity of the defendant’s home in Los Angeles. (Id. at p. 979.) The defendant, who was drunk at the time, gave conflicting accounts of his involvement in the shooting. (Id. at p. 991.) His accounts centered around a car, specifically, an Oldsmobile, that was different from the victim’s car that was actually hit. The court explained, “[Defendant] admitted that he pointed his gun at the Oldsmobile’s occupants and intended to shoot them. However, there was also evidence he pointed the gun at the Oldsmobile after it left and then the gun discharged. There was no evidence that he carefully aimed at the Oldsmobile’s occupants when he fired. [The defendant] at one point told police he mistakenly pulled the gun’s trigger and the gun went off. He denied pointing at the Oldsmobile and following it as it drove away.” (Id. at p. 991.) The defendant stated that the Oldsmobile was “far” away from him when he shot, and he did not see the victim’s car. (Id. at pp. 991-992.)
The Bejarano court concluded, “Given the subjective mental component of implied malice and the above recited facts, a jury reasonably could have concluded that the issue of whether [the defendant] harbored malice (express or implied) was not reasonably free from dispute. Accordingly, the jury reasonably could have convicted [the defendant] of second degree murder based on a felony-murder theory and not malice, either because convicting him on the less demanding theory of felony murder made it unnecessary to reach the issue of whether appellant harbored malice, or because the jury actually entertained a reasonable doubt that he harbored malice.” (Bejarano, supra, 149 Cal.App.4th at p. 992.)
*928 The facts here are even more compelling than in Bejarano, since the jury could reasonably have determined that Hansen did not know that the apartment was occupied at the time of the shooting, as we have explained. While ample evidence would have supported a jury finding of implied malice here, we cannot say that a contrary finding would be unreasonable. (See People v. Gonzalez, supra, 54 Cal.4th at p. 666.) The prejudicial effect of the erroneous felony murder instruction is thus apparent, and a new trial is required.
3
The District Attorney further argues that Lucero supports a finding of harmless error here. We disagree. Unlike Lucero, where the felony-murder rule was given “short shrift at trial” and “was virtually ignored in closing arguments” (Lucero, supra, 200 Cal.App.4th at pp. 48, 49), the rule here was the subject of substantial instruction by the court and argument by counsel. The jury’s verdict in Lucero also found the defendant guilty of additional counts of attempted murder, which showed that the jury found malice as to those victims: “No juror who correctly followed the instructions could arrive at a verdict of attempted murder without addressing the question of malice aforethought and resolving it against Lucero.” (Id. at p. 51.) The Lucero court concluded that the jury’s guilt determinations on the attempted murder counts “ ‘leave no reasonable doubt that the jury made the findings necessary for conscious-disregard-for-life malice.’ ” (Ibid., quoting Chun, supra, 45 Cal.4th at p. 1205.)
Here, unlike in Lucero, there is nothing in the jury’s verdict that shows that it made the required findings of malice that would support Hansen’s second degree murder conviction on a valid theory of implied malice. The District Attorney’s reliance on Lucero is therefore unavailing.
4
In light of our conclusion that the error was prejudicial based on the jury’s verdict and evidence presented at trial, we need not address Hansen’s additional arguments regarding prejudice. We note specifically that we have not relied on the juror declarations and questionnaires obtained by Hansen’s trial counsel. These documents purport to reflect the jury’s reasoning and mental impressions regarding their verdict. As such, they are inadmissible to impeach the jury’s verdict, as Hansen seeks to do here. (See Evid. Code, § 1150; People v. Sutter (1982) 134 Cal.App.3d 806, 820 [184 Cal.Rptr. 829].)
The District Attorney’s failure to object to these declarations and questionnaires at Hansen’s trial is of no moment. “[E]vidence that violates *929 Evidence Code section 1150 is not merely inadmissible; it is irrelevant—‘of no jural consequence.’ [Citation.] Thus, the People did not have to object below to preserve this contention.” (People v. Johnson (2013) 222 Cal.App.4th 486, 494 [166 Cal.Rptr.3d 316]; see People v. Lindberg (2008) 45 Cal.4th 1, 53 [82 Cal.Rptr.3d 323, 190 P.3d 664].)
DISPOSITION
The order is affirmed.
McDonald, J., concurred.

 All further statutory references are to the Penal Code unless otherwise specified.

 Our Supreme Court has stated that an appellate opinion will govern convictions not yet final on appeal where the opinion does not announce a change in the law or where the opinion announces a new rule of law where no rule existed before. (See People v. Guerra (1984) 37 Cal.3d 385, 399 [208 Cal.Rptr. 162, 690 P.2d 635] (Guerra).) Where an opinion announces a new rule of law, but a contrary rule previously existed, “the courts may choose to make, on grounds of policy, an exception to ‘the ordinary assumption of retrospective operation’ [citation].” (Id. at p. 401.) “At the present time the California courts decide whether to make such an exception by weighing the three factors summarized in Stovall v. Denno (1967) 388 U.S. 293, 297 [18 L.Ed.2d 1199, 87 S.Ct. 1967]: ‘(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of "a retroactive application of the new standards.’ [Citations.]” (Guerra, supra, at p. 401; see People v. Garcia (1984) 36 Cal.3d 539, 548-549 [205 Cal.Rptr. 265, 684 P.2d 826].)

 Because Chun resulted in a reinterpretation of the statute governing murder, particularly its language pertaining to an “abandoned and malignant heart,” it could be argued that our Supreme Court’s decision in Mutch requires that we apply Chun retroactively to convictions that were final on appeal without reference to the tripartite test, which appears tailored to procedural, and not substantive, changes in criminal law. (See Mutch, supra, 4 Cal.3d at p. 394.) The federal courts appear to use a rule similar to that articulated in Mutch. Under the federal standard, changes to the scope of substantive federal criminal law must generally be applied retroactively to convictions that are final on appeal. (See Schriro, supra, 542 U.S. at pp. 351-352.) However, given our conclusion that Chun should be applied retroactively even under the tripartite test, and since the parties have not addressed the applicability of Mutch in their briefing, we decline to discuss it here.

 The Supreme Court in Hansen later determined, contrary to counsel’s statements and the trial court’s belief, that a jury could find both second degree felony murder and the personal firearm use enhancement. (Hansen, supra, 9 Cal.4th at p. 316.)

 As noted previously (see fn. 4, ante), in Hansen, supra, 9 Cal.4th at page 316, the Supreme Court clarified that there is in fact no such conflict under California law.

 Contrary to the dissent’s suggestion, implied malice requires more than knowledge that one’s conduct is “dangerous” or “extremely dangerous.” (See Chun, supra, 45 Cal.4th at p. 1181.) It is likewise insufficient that the underlying offense at issue here, shooting at an inhabited dwelling, has been characterized as an “inherently dangerous” felony in the abstract. (Hansen, supra, 9 Cal.4th at pp. 310-311.) A defendant who commits an inherently dangerous felony need not subjectively appreciate that his conduct is, in fact, inherently dangerous. (See People v. Ramirez (2009) 45 Cal.4th 980, 985 [89 Cal.Rptr.3d 586, 201 P.3d 466] [elements of shooting at an inhabited dwelling are “(1) acting willfully and maliciously, and (2) shooting at an inhabited house”].) By contrast, implied malice requires that a defendant subjectively know that his conduct carried a high probability of death. (See People v. Canizalez, supra, 197 Cal.App.4th at p. 842; see also Chun, supra, 45 Cal.4th at p. 1181.)

 Similarly, we agree with dicta in People v. Taylor (2004) 32 Cal.4th 863, 868 [11 Cal.Rptr.3d 510, 86 P.3d 881] (Taylor), that “if a gunman simply walked down the hall of an apartment building and fired through the closed doors, he would be liable for the murder of all [of] the victims struck by his bullets . . . ,” i.e., there would be sufficient evidence under those facts to support a conviction for second degree murder on a theory of implied malice. (Ibid.) In Taylor, the Supreme Court considered whether a defendant who fatally shot a pregnant woman could be liable for second degree implied malice murder of her fetus, even though the defendant did not know that the woman was pregnant. (Id. at p. 865.) Analogizing those facts to the apartment gunman, the Supreme Court determined that the defendant could be liable for second degree implied malice murder of the fetus: “When a defendant commits an act, the natural consequences of which are dangerous to human life, with a conscious disregard for life in general, he acts with implied malice towards those he ends up killing. There is no requirement the defendant specifically know of the existence of each victim.” (Id. at p. 868.)
The scenarios considered in Taylor are distinguishable from the facts here. Hansen’s corroborated testimony was that he knocked on doors and windows of the apartment before he shot. Unlike the hypothetical apartment gunman in Taylor, Hansen thus arguably had reason to believe that the apartment was unoccupied at the time he shot into it. In addition, the defendant in Taylor knew of the existence of the pregnant woman (although not the fact of her pregnancy) when he shot her. (Taylor, supra, 32 Cal.4th at p. 866; see id. at p. 869 [“In battering and shooting [the woman], defendant acted with knowledge of the danger to and conscious disregard for life in general. That is all that is required for implied malice murder. He did not need to be specifically aware how many potential victims his conscious disregard for life endangered.”].) Moreover, unlike Taylor, the relevant question here is not whether there is substantial evidence that would support Hansen’s conviction. Instead, we must “exhaustively review[] the trial evidence to determine ‘whether the record contains evidence that could rationally lead to a contrary finding . . .’ [Citations.]” (People v. Gonzalez, supra, 54 Cal.4th at p. 666.) The scenarios considered in Taylor are of little relevance to this task. Taylor does not mandate, or even imply, that the hypothetical apartment gunman would be liable for second degree implied malice murder under all circumstances. Where, as here, the evidence could lead a rational juror to conclude that a defendant did not have a “conscious disregard for life” (Taylor, supra, at p. 869), liability is not a foregone conclusion.